A06A1995, A06A1996. IN THE INTEREST OF A. B. et al., children (two cases).
(640 SE2d 702)

ADAMS, Judge.

In separate appeals, the mother and father of three children appeal the termination of their parental rights.

On appeal from a termination order, this Court views the evidence in the light most favorable to the appellees and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parents' rights to custody have been lost. *In the Interest of S. H.*, 251 Ga. App. 555 (1) (553 SE2d 849) (2001). "We do not weigh the evidence and must defer to the trial judge as the factfinder." (Citation and punctuation omitted.) *In the Interest of C. F.*, 251 Ga. App. 708 (555 SE2d 81) (2001).

N. B., the mother, and J. B., the father, were married in October 2000, and had a good marriage by their account. N. B. had an older daughter A. H. through a prior relationship, who was born December 27, 1998, and who initially lived with N. B. and J. B. after they got married. A. H. is not a subject of this action. J. B. has two children by a previous marriage who live in Missouri with his mother. In August 2003, J. B.'s parental rights to those children were terminated for abandonment. N. B. and J. B. have four children of their own; the three oldest are the subject of this termination proceeding. They are C. B. (born May 25, 2001), A. B. (born December 26, 2002), and K. B. (born July 14, 2004).[1] The couple's fourth child, H. B., was born

---

[8] *Johnson v. State*, 195 Ga. App. 723, 724 (3) (394 SE2d 586) (1990); see *Garland v. State*, 213 Ga. App. 583, 584 (4) (445 SE2d 567) (1994).

[1] On appeal of a decision to terminate parental rights "the anonymity of the child shall be preserved by appropriate use of initials." OCGA § 15-11-95 (a).

November 16, 2005, during the pendency of this proceeding, and is not a subject of this action. All four children are in foster care together.

Shortly after December 31, 2003, N. B.'s older sister Mary called the Wilkinson County Department of Family and Children Services (DFCS) concerned that J. B. was sexually abusing A. H. who had just turned five years old. When confronted by Mary, N. B. admitted that she believed her husband and not the child. Nevertheless, in January 2004, as a result of the allegations, N. B. agreed to give primary custody of A. H. to the child's biological father and agreed that J. B. could have no contact with her. N. B. claims that she did not find out until February 2005 that the alleged abuse was sexual and that she then confronted J. B. who denied it. But N. B.'s sister testified that N. B. knew the nature of the allegations from the beginning. Mary told N. B. to divorce J. B. at that time. But, according to Mary, N. B. has never accepted that the allegations regarding A. H. were true. And although J. B. temporarily left the home at that time, the couple did not then divorce, and at some point J. B. came back to the home. A. H. never returned.

On January 22, 2004, in an unrelated matter, J. B. was interviewed by Special Agent Rickey Harvey of the Georgia Bureau of Investigation. J. B. had been accused of molesting his sister's daughter several years earlier in Missouri. He had been accused of fondling the child's vaginal area and making the child perform oral sex on him. He denied the allegations but offered that while playing with the child he could have accidentally touched her between her legs. There is no other information in the record regarding this allegation.

One year later, on February 22, 2005, N. B. received a call from Shonda Robinson of DFCS. Robinson asked the family to come to the sheriff's office because someone had alleged that the boys had been sexually abused, primarily C. B., who was then three years and nine months old. At this point, DFCS instructed J. B. to leave the family home, and he did. The children were taken into custody. Robinson never questioned C. B. about the allegations of sexual abuse.

On March 11, 2005, Agent Harvey again interviewed J. B., this time in connection with the allegations regarding C. B. J. B. denied the allegations and said that at one time his son had bowel problems — constipation — and that he may have bled at the rectum. At the final hearing, a neighbor and friend of N. B.'s who had babysat for C. B. corroborated the story about the little boy's constipation, including that he would cry at times when using the bathroom. The child would say that his tummy hurt. N. B. also had witnessed the child having constipation, including seeing traces of blood in his stool, and had taken him to the doctor about it, although no other evidence of a trip to the doctor was offered. But another witness testified that J. B. at one time explained that the injury could have happened when

he "got a little rough" playing football with C. B. N. B. told Agent Harvey that she did not know that anything was going on and she did not know who to believe. Harvey did not consider N. B. a suspect. Agent Harvey also never spoke to C. B.

Dr. Debbie West examined C. B. on February 23, 2005, and concluded that the child's anus had symptoms that were consistent with penetration and sexual abuse, but that she could not rule out other causes such as constipation. Neither K. B. nor A. B. had similar symptoms, although A. B., then age two, had a fissure in his anus.

On March 18, 2005, Samantha Davis, a forensic interviewer at the Sunshine Center, a part of Open Arms, interviewed C. B., and the child stated that his father had "hurt his butt," although he did not say with what. Davis understood the child's statement to mean that his father had acted sexually. Davis acknowledged that the child has a speech impediment.

On March 24, DFCS issued reunification case plans for the three children, one requirement of which was that J. B. not reside in the home or have contact with the children. N. B. completed most of the case plan goals promptly. But throughout March and April, the parents presented a united front in denying the allegations. In addition to J. B.'s denials, N. B. did not believe that her husband could have done what was alleged. She was hopeful of the family being reunited, including J. B.

On May 6, 2005, the juvenile court held a hearing on the allegations of deprivation. Based on the evidence presented, including but not limited to that set out above, the court found that J. B. had "committed egregious conduct toward the child in that he has molested [C. B.]."[2] The court also found that N. B. "refuses to believe that the father has molested their child, apparently requiring proof sufficient to convict him in a criminal court." She also refused to acknowledge that it was possible that he molested her daughter A. H., and she let J. B. come back into the home twice after allegations were raised that her husband had molested children. For these reasons and because she had knowledge of prior allegations, the court concluded that she failed to protect her children. The court held that clear and convincing evidence established that the children were deprived, that reunification efforts were not in the best interests of the children, that grounds existed for termination, and that DFCS should pursue adoption. That order was not appealed. After the May 6, 2005 hearing, the case plan was changed to adoption and there were no goals for the mother to meet.

---

[2] The transcript of the deprivation hearing is not in the record.

As of May 6, 2005, N. B. was still of the opinion that her husband had not molested any of the children. She believed that he was "innocent until proven guilty." Indeed, after the hearing she returned home with him and lived with him, even though the juvenile court had found clear and convincing evidence that J. B. had abused one of the children. She testified that she did so because she was told he could stay there because the children were in foster care.

J. B. resided in the home from May 6 until August 2005 when he was arrested for sexual crimes against C. B., his niece, and N. B.'s older child A. H. Even then, N. B. commented that the arrest did not prove J. B.'s guilt. But she asked the DFCS caseworker what effect it would have if she divorced J. B. and was told that the termination proceedings would continue. She filed for divorce on September 20, 2005, and claimed the marriage was "irretrievably broken as provided for in [OCGA §] 19-5-3 (13)"; she explained that she did not know whether she could trust him.

On October 3, 2005, DFCS petitioned to terminate both parents' rights to the three children. On November 16, 2005, N. B. gave birth to H. B., who now is also in custody. The divorce became final on December 12, 2005. But between August 21, 2005 and December 14, 2005 — while the divorce was pending — N. B. accepted 359 collect calls from J. B. in jail, and the couple talked a total of 4,538 minutes. As of about December 2005 or January 2006, N. B. still did not believe that her husband had abused the boy.

In January 2006, at the final hearing on the termination, N. B. testified that she was "unsure" about J. B.'s guilt and she could not imagine when he could have done anything because she was usually around, she did not see any signs, and her children never told her anything. She said, "He could have [done it], or he could not have done it." But even if he were found not guilty, she claimed she would not take him back because she would have DFCS in her life thereafter and she would rather have her children back than put up with that. She testified that she had no intention of ever getting back together with J. B. Although she spoke with her husband while the divorce was pending, once the divorce was granted she stopped with two exceptions, the last being on December 14, 2005. She testified that even though he writes to her, she does not write back.

N. B. visits the children regularly. In accordance with the case plan, she has submitted to a psychological evaluation, and she and J. B. have completed parenting classes. N. B. has been cooperative with DFCS, including after the case plan was changed to nonreunification. But she did not pay any child support in December 2005 or January 2006. N. B. was unemployed at the time of the hearing and was living with her parents. She had to go on medical leave due to pregnancy complications, then her position was terminated after she

gave birth to H. B. She admitted that she was not ready to have the children come home with her on the day of the hearing, and pictures of her home supported that statement. N. B.'s sister agreed that N. B. was not ready to have the children back. She was afraid that when J. B. is released from prison, N. B. will take him back because she still loves him.

The foster mother testified that she has observed C. B. and A. B. playing with their feces and urinating in the bedrooms. They have received counseling. And their general behavior regresses somewhat after they visit their mother.

The guardian ad litem had met but not interviewed the children. He supported termination of the father's rights. But with regard to the mother, he said "the issue . . . is not as clear." He stated that the issues were (1) "whether . . . her emotional ties to the father are so strong that we are in danger of the children being exposed to him if he is ultimately exonerated, or if he gets out of prison if he's been convicted"; and (2) "did her emotional ties to the father overwhelm her good judgment and allow her to enable an environment to happen, where she was negligent in her parenting, so to speak." He concluded by testifying, "I didn't see any evidence of either one of those." So, he was not inclined to recommend termination of the mother's rights, but rather he deferred to the judge's opinion on the matter. He added that the children all want to go back with their mother.

Dr. Stephen Kyle Knauts, Ph.D. was accepted as an expert witness in clinical psychology and sexual deviancy. He conducted a psychosexual evaluation of J. B. in June 2005; the evaluation lasted one hour. J. B. told him that he had been sexually abused by an older sister when he was six or seven, and later physically abused as well. The evaluation revealed the following: J. B. was of average intelligence and competent, defensive, prone to presenting himself in an overly favorable light, prone to acting out when under stress, possibly naive about psychological issues, not inclined to substance abuse, possibly inclined toward falsely denying sexual issues, and he had below average sexual functioning. The doctor's tests did not determine whether J. B. was a sexual offender, and he offered no opinion on that issue.

In determining whether to terminate parental rights, a juvenile court applies a two-step analysis:

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the

deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.

(Footnotes omitted.) *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000); see OCGA § 15-11-94 (b) (4) (A).

1. *Parental Misconduct or Inability.* We find that there was clear and convincing evidence to support a finding by the juvenile court of parental misconduct or inability based upon the statutory factors.

(a) Deprivation. Following the deprivation hearing, the juvenile court found clear and convincing evidence that J. B. had molested C. B. and that N. B. had failed to protect her children from him, and that therefore the children were deprived. Because neither J. B. nor N. B. appealed the juvenile court's order, they are bound by that determination. *In the Interest of B. L. S.*, 239 Ga. App. 771, 774 (521 SE2d 906) (1999).

(b) Lack of proper parental care or control as a cause. The failure to appeal the deprivation order renders the juvenile court's determination on this second factor binding as well. *In the Interest of A. G.*, 253 Ga. App. 88, 89 (1) (b) (558 SE2d 62) (2001); *In the Interest of R. G.*, 249 Ga. App. 91, 93 (1) (a) (547 SE2d 729) (2001). Furthermore, evidence supports the juvenile court's finding that the parents' actions were the cause of the deprivation, namely J. B.'s actions toward C. B. and A. H. and N. B.'s failure to protect the children from the possibility that the allegations about J. B. were true. Indeed, despite the court finding clear and convincing evidence that J. B. had abused C. B., N. B. continued to trust J. B. and allowed him back into the home with the hopes that the entire family would be reunited. Lack of proper care may be established by showing past egregious conduct of the parent toward another child of a sexually abusive nature as well as "past physical, mental, or emotional neglect of the child or of another child by the parent." See OCGA § 15-11-94 (b) (4) (B) (iv), (v). The evidence was sufficient to show this factor.

(c) The cause of the deprivation is likely to continue. "[E]vidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in [his or] her natural child; clear and convincing evidence of *present* unfitness is required." (Citations and punctuation omitted; emphasis in original.) *In the Interest of K. M.*, 240 Ga. App. 677, 680 (523 SE2d 640) (1999). "But the trial court is entitled to consider evidence of the [parents'] past actions in determining whether the deprivation is likely to continue. It is not bound by mere promises

to do better in the future." (Citations omitted.) *In the Interest of A. M.*, 259 Ga. App. 537, 542 (578 SE2d 226) (2003).

Here, there is evidence that J. B. had abused more than one child. Furthermore, the psychiatrist testified that without an admission of wrongdoing and prolonged proper care, an abuser should not be allowed to have contact with any children. J. B. had made no such admission. This evidence was sufficient to support the conclusion that J. B.'s behavior was likely to continue.

With regard to N. B., from May 6, 2005 through when J. B. was arrested, she lived with him despite the findings at the deprivation hearing and despite the case plan requiring that he not reside in the home. She never left J. B. of her own accord during that time, she has never acknowledged that J. B. could have molested the children, and she even continued to talk to him on the phone over 300 times when he was in jail on charges of sexual abuse. N. B. was aware of multiple allegations of child abuse against J. B. but failed to take protective action, and, in one circumstance, she agreed to give up one of her children and to stay with J. B. instead. Finally, N. B.'s sister testified that N. B. still loved J. B. The above evidence supports the conclusion that for N. B., J. B. comes first and that she will continue to side with him at the expense of the children. "Judging the credibility of the mother's good intentions was a task for the juvenile court. [Cit.]" *In the Interest of J. V.*, 253 Ga. App. 798, 802 (560 SE2d 725) (2002). Therefore, there was sufficient clear and convincing evidence for the juvenile court to conclude that N. B.'s failure to protect the children is likely to continue.

(d) Continued deprivation is likely to cause serious harm to the child. "[I]t is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child." *In the Interest of J. T. W.*, 270 Ga. App. 26, 37 (606 SE2d 59) (2004). But in this case it is obvious that continued sexual abuse of any one of the boys would cause harm to all three. And, a continued failure to protect the children from J. B. in the event that he is released is also evidence that supports the conclusion that serious harm would result in the future. The mother also admitted that she was not prepared to take the children back at the time of the final hearing, and the court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. *In the Interest of J. V.*, 253 Ga. App. at 803.

*In the Interest of V. E. H.*, 262 Ga. App. 192, 197 (2) (585 SE2d 154) (2003), is physical precedent only and therefore not controlling. Furthermore, in this case, unlike in *V. E. H.*, the mother resumed relations with the father after a juvenile court determined that there

was clear and convincing evidence that the father had abused the child. And she did not appeal that decision.

2. *Best Interest of the Child.* The evidence presented at the hearing and discussed above supports the juvenile court's conclusion that terminating the parents' parental rights was in the best interests of the children. "The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest. [Cit.]" *In the Interest of D. L.*, 268 Ga. App. 360, 360-361 (601 SE2d 714) (2004).

> [A] finding as to whether the termination of parental rights is in the best interest of the child represents, in essence, a finding as to whether the specifics of the parental default that have *otherwise* been found to exist are of such magnitude as to warrant the conclusion that the child himself would be better served by the grant of the petition to terminate.

(Citations and punctuation omitted.) *In the Interest of B. P.*, 207 Ga. App. 242, 245 (427 SE2d 593) (1993).

The juvenile court found that the children were in need of supervision, treatment, and rehabilitation; that the children are and will continue to suffer from the deprivation; and that a continued relationship with the parents would cause further harm. Furthermore, termination would enable the children to achieve a more stable and safe life through adoption or other appropriate permanency plan and it would ameliorate the harm that the children "would otherwise suffer." The record also supports the juvenile court's conclusion that the mother would not protect the children from J. B. in the future. Accordingly, the court concluded, termination was in the best interests of the children.

A juvenile court has broad discretion when determining what is in the best interests of the children, and we will not reverse in the absence of manifest abuse of that discretion. *In the Interest of M. C.*, 243 Ga. App. 707, 711 (534 SE2d 442) (2000). We find no abuse here.

3. Finally, our review of the juvenile court's order indicates that the court made the required specific findings of fact and conclusions of law as to each statutory factor amounting to parental misconduct or inability. See *In the Interest of S. W. J. P. D.*, 275 Ga. App. 272, 273 (620 SE2d 497) (2005).

*Judgment affirmed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED DECEMBER 27, 2006.

*Blanton C. Lingold*, for appellant (case no. A06A1995).

*Carl S. Cansino*, for appellant (case no. A06A1996).

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Virginia B. Fuller, Assistant Attorney General, Thomas J. O'Donnell, Douglas L. Price*, for appellee.