A06A1777. IN THE INTEREST OF B. S., a child.
(642 SE2d 408)

MIKELL, Judge.

The mother of B. S. appeals from the juvenile court's order terminating her parental rights in her son, arguing that the evidence was insufficient. We find no error and affirm.

A juvenile court's termination of parental rights is a two-step process:

> The first step requires a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical,

---

mental, emotional, or moral harm to the child. If these four factors are satisfied, the court must then determine whether termination of parental rights is in the child's best interest, considering physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home.[1]

"On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost."[2]

So viewed, the evidence shows that in January 2005, the Department of Family and Children Services (the Department) received reports that the mother and her seven-year-old son were being abused by the mother's boyfriend, Greg Oliphant. When authorities investigated, they found no heat, no door locks, and a coat lying next to an electric heater in B. S.'s bedroom. They also determined that the child was not receiving his prescription medication.

A psychological evaluation of the mother found that she was mildly mentally retarded, that she suffered from chronic and severe post-traumatic stress disorder with hallucinations, and that she had been sexually abused as a child and physically abused as an adult. The examining psychologist concluded that since the mother was not likely to be able to care for her son given his special needs, she should not regain custody. B. S. told the same psychologist that he had been fondled and sodomized by Oliphant, who would dress in women's clothes and assume a female name during the abuse. The child would often cry hysterically at night that Oliphant "was coming to get him" through the window or the walls, and had nightmares about him after visits with his mother. The psychologist found that B. S. was indeed the victim of sexual abuse and that he exhibited chronic post-traumatic stress disorder and obsessive-compulsive behavior. B. S. has repeated kindergarten twice.

On March 9, 2005, the Department developed a reunification plan under which the mother would be required to obtain and maintain stable, clean, and safe housing; complete parenting and anger management classes; complete a treatment program and remain drug- and alcohol-free for six months; bar any abusive man from her home; pay child support; and attend to the child's medical needs.

---

[1] (Footnotes omitted.) *In the Interest of T. F.*, 250 Ga. App. 96, 98 (1) (550 SE2d 473) (2001); see also OCGA § 15-11-94 (a), (b) (4) (A) (i)-(iv).

[2] (Footnote omitted.) *In the Interest of F. C.*, 248 Ga. App. 675 (549 SE2d 125) (2001).

On March 21, 2005, however, Oliphant was charged with aggravated battery and stalking. A few days later, after the mother stipulated to the fact that her child was deprived, the juvenile court entered an interlocutory order of deprivation pending service by publication on the child's father, and granted custody to the Department.

After the Department filed a petition for termination, Oliphant pled guilty to aggravated battery and was sentenced to five years on probation. Evidence at the termination hearing showed that (1) the mother was still communicating with Oliphant in April 2005, shortly after the establishment of her case plan; (2) a man hung up on a caseworker as she tried to reach the mother on August 17 concerning a counseling appointment, and the mother refused to let the caseworker enter the home later that day; (3) the mother told the caseworker on August 25 that she had allowed Oliphant to move in a month ago because she needed "someone to live with," that she loved Oliphant, and that he had never hurt her son; (4) at the end of the same conversation, the mother became enraged with the caseworker and threw a glass bottle at her as she fled to her car; and (5) the mother acknowledged having had bones broken by Oliphant but called his abuse "okay" before losing her temper and screaming at an interviewing counselor for 30 minutes. The record also showed that from the time of the case plan, the mother defended Oliphant continuously, calling her son a "liar" for maintaining that Oliphant had abused him.

The evidence at the termination hearing also showed that B. S. was upset and would soil his pants during his visits with his mother. A counselor observing a March 2005 visit noted that the mother did not interact with her son and that he was not affectionate with his mother, and concluded that there was no evidence of any parent-child bond between them. With his foster mother, however, the boy had progressed from being "totally nonverbal, hiding behind the furniture, not eating, [and] gnawing on his hands until they [bled]" to "eating, writing his name, [and] talking." The boy no longer needed medication and was doing well in school.

The mother succeeded in maintaining housing and attended all her parenting classes, but missed some counseling sessions and tested positive for marijuana on a number of occasions. A state probation officer testified that Oliphant gave the mother's address as his own, and he was present at the mother's home on August 23, when probation officers arrived looking for him.

On October 4, 2005, the juvenile court entered an interlocutory order terminating the mother's rights pending service of the child's father via publication. After that publication and a hearing, the mother's motion for new trial was denied.

1. *Parental Misconduct or Inability.* Construing the evidence in the light most favorable to the juvenile court's findings, we address each of the relevant factors in turn.

(a) *Deprivation.* Since the mother stipulated to and did not appeal the juvenile court's finding of deprivation, she is bound by that finding for purposes of the termination hearing.[3] The juvenile court also took notice of its prior deprivation orders in its termination order. The evidence referenced therein was sufficient to show that B. S. was deprived.

(b) *Lack of Parental Care or Control.* Based on the evidence outlined above, a rational trier of fact could have found clear and convincing evidence that the mother's lack of proper parental care or control caused B. S. to be deprived.[4] Specifically, a mental disability of the kind exhibited by the mother here, her failure to provide for her child's housing and medical needs, and above all her failure to protect her son from her boyfriend's sexual abuse, amount to clear and convincing evidence of the mother's lack of proper care and control.[5]

(c) *Lack of Care or Control Likely to Continue.* Evidence of past conduct may be considered in determining whether the deprivation is likely to continue if the child is returned to the parents.[6] Here, the mother not only refused to protect her son from Oliphant, who sexually abused him, but refused to believe her son's accounts of the abuse, calling him a "liar." This and other evidence was sufficient to authorize the juvenile court's finding that the mother's lack of proper parental care or control was likely to continue.[7]

(d) *Serious Harm to the Child.* The juvenile court determined that the deprivation of B. S. was likely to continue, and was entitled to infer from the same evidence supporting that conclusion that the deprivation would cause serious harm to B. S. if he were returned to his mother.[8]

On the record before us, then, we conclude that the juvenile court could have found clear and convincing evidence of parental misconduct or inability.[9]

---

[3] See *In the Interest of H. D. T.*, 273 Ga. App. 863, 866 (a) (616 SE2d 196) (2005).

[4] See OCGA § 15-11-94 (b) (4) (C) (i)-(iii).

[5] See *In the Interest of S. G.*, 271 Ga. App. 776, 780-781 (611 SE2d 86) (2005) (mother suffering from and denying the existence of paranoid schizophrenia was not capable of caring for her child); *In the Interest of A. B.*, 283 Ga. App. 131, 136 (1) (b) (640 SE2d 702) (2006) (mother failed to protect child from father's sexual abuse).

[6] See *In the Interest of A. B.*, supra at 136 (1) (c).

[7] Id. (evidence that mother would continue to side with abusive father was clear and convincing evidence that mother's failure to protect was likely to continue).

[8] See id. at (1) (d) (continued sexual abuse of any one of three children would cause harm to all three); *In the Interest of S. G.*, supra.

[9] See OCGA § 15-11-94 (b) (4) (A) (i)-(iv).

2. When clear and convincing evidence of parental misconduct or inability exists, the juvenile court then considers whether termination of parental rights is in the best interest of the child, in light of the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home.[10] "A juvenile court has broad discretion when determining what is in the best interests of the children, and we will not reverse in the absence of manifest abuse of that discretion."[11] The same evidence showing parental misconduct or inability may, and here does, establish that B. S.'s best interest required the termination of the mother's parental rights.[12]

Since a rational trier of fact could have found clear and convincing evidence of the mother's misconduct or inability, and that termination of the mother's parental rights was in the best interest of her son, the juvenile court did not err in terminating the mother's rights as to that child.

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED FEBRUARY 23, 2007.

*Wesley G. Person*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Mallory & Trice, John R. Mallory*, for appellee.

---

[10] OCGA § 15-11-94 (a).

[11] (Citation omitted.) *In the Interest of A. B.*, supra at 138 (2).

[12] Id.; see also *In the Interest of S. G.*, supra.