643 S.E.2d 255 (2007)
In the Interest of T.W.O. et al., children.
Nos. A06A2034, A06A2035.
Court of Appeals of Georgia.
February 28, 2007.
*256 Jerry F. Pittman, Office of the Public Defender Coweta Circuit, Carrollton, Jon C. Rhoades, Lagrange, for appellant (case no. A06A2034).
Meacham, Earley & Fowler, David A. Fowler, for appellant (case no. A06A2035).
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Doris C. Orleck, Newnan, Assistant Attorneys General, for appellee.
MIKELL, Judge.
In separate appeals, the mother and father of three boys, T.W.O., L.D.O., and J.D.O., appeal the juvenile court's order terminating their parental rights. This lengthy saga includes a multitude of interactions over the years between the parents and the Troup County Department of Family and Children Services (the "Department"), culminating in a definitive termination hearing in juvenile court in June 2005. Having determined that the evidence supports the termination and that no reversible error occurred, we affirm the termination order.
On appeal from a termination order, this Court views the evidence in the light most favorable to the [Department] and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost. We do not weigh the evidence or determine the credibility of witnesses, but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[1]
Construed in favor of the judgment, the evidence shows that in October 2001 the Department received a report that appellants' sons, then nine, six and five years old, had *257 been sleeping in a van and were not attending school. The father was homeless and in jail on a DUI probation violation; the mother had drug problems and no stable home or employment.[2] The boys were removed from the home and placed in the protective custody of the Department; they have been in foster care ever since.
Following a deprivation hearing on December 11, 2001, the juvenile court found that the children were deprived due to the father's neglect, inadequate housing, and lack of supervision, and due to the mother's substance abuse and mental and emotional problems. The mother and father each stipulated to the finding of deprivation. The court entered another deprivation order on October 17, 2002, by consent of the parties. These orders were not appealed.
In December 2001 a reunification case plan was approved, requiring that the father obtain stable housing, submit to drug tests, remain drugand alcohol-free, cooperate with his probation officer, and avoid violating probation; and that the mother obtain a stable source of income and stable housing, undergo drug tests, and remain drug-free. In the ensuing months and years, however, the parents failed to meet the case plan goals. The father failed to pay child support; missed a drug screening in November 2002 because his whereabouts were unknown; tested positive for cocaine at a February 2003 screening; failed to maintain stable housing; and failed to provide current contact information to the Department, according to the testimony of their caseworker at the time. The mother never paid child support, failed to maintain stable housing, and tested positive for cocaine in October 2002 and February 2003.
The judicial citizen review panel reviewed the case at least twice a year from January 2002 to July 2004. In its first two reviews the panel recommended reunification; however, in January 2003 the panel changed its recommendation to nonreunification, finding that the mother had tested positive for cocaine use in November 2002; that the mother was living in a motel and the father's whereabouts were unknown; and that neither parent had stable housing. All subsequent panel reviews recommended nonreunification, termination of parental rights, and adoption as the permanent plan.
In March 2003, following a hearing at which both parents were present and represented by counsel, a nonreunification plan was approved by the juvenile court, which found that the Department had made reasonable efforts to allow the children to return safely to their homes; that both parents had recently tested positive for drugs; and that neither parent had obtained stable housing, paid child support, or made progress toward providing a permanent home for the children.
In its deprivation order entered following a hearing on October 14, 2003, the court found that the children remained deprived, extended custody of the children with the Department, and approved termination and adoption as the permanent plan. Like the first two deprivation orders noted above, this order was not appealed.
The court-appointed special advocate ("CASA") reported in April 2002 that the father allowed his sons to watch pornography with him; the boys may have been sexually molested while placed with the father's sister; the father's whereabouts were unknown; the mother had no housing and had been repeatedly hospitalized for depression and psychosis but denied needing medication for her mental condition; the mother claimed to have used no drugs for years, but then admitted to using methamphetamine during the past weekend; and the oldest son, T.W.O., stated that he wanted nothing to do with either parent. More than two years later, in July 2004, the CASA recommended termination of parental rights and adoption of the children by their current foster family, with whom they had been placed in March 2004.
The petition to terminate appellants' parental rights was filed on April 21, 2004, more than a year after the nonreunification order had been entered. At the termination hearing on July 27, 2004, after testimony was heard, the hearing was continued by agreement *258 of the parties until December 2004, in order that both parents could complete psychological evaluations, submit to random drug testing, and pursue new reunification case plans to be prepared by the Department. Before the case was reconvened in December 2004, however, the father's counsel died suddenly, and the case was continued until March 2005.
When the parties reconvened in March 2005, the Department still had not prepared a new reunification case plan. The parents moved that the case be dismissed for the Department's failure to issue a new case plan as contemplated by the juvenile court at the July 2004 hearing and in its order of January 13, 2005. The court denied this motion, and the Department finally issued a new case plan on March 30, 2005. Although both parents made an effort to comply with this new case plan, albeit three and a half years after they lost custody of their sons, neither parent had achieved a stable financial or housing situation by the time of the June 2005 termination hearings.
The termination proceedings were resumed on June 16 and 22, 2005. At the end of testimony, the guardian ad litem recommended that the juvenile court terminate the parental rights of the mother and father. He pointed out that the parents had failed to improve their situations for more than two and a half years, from October 2001 to the first termination hearing in July 2004; and that the children had been waiting for permanency for almost four years and should not be forced to wait any longer.
The evidence presented at the termination hearings showed that, in the summer of 2004, the mother moved from a two-bedroom trailer into a three-bedroom home. The Department did not approve this home in its home evaluation, because of ongoing concerns about the mother's mental health problems and her insecure financial condition. The mother was unable to work full-time because, she said, "emotionally, I just couldn't handle it." She was receiving social security disability payments but did not know what her disability was, nor did she seem to understand why she was receiving benefits. She had been on medication for schizophrenia and she continued to be on medication for depression at the time of the June 2005 termination hearings. She admitted to prior arrests for DUI and passing bad checks, as well as to abusing drugs in the past, including methamphetamine, cocaine, and alcohol. She claimed that she never used drugs while caring for her children; instead, she left the children with her then-boyfriend, a marijuana user. Although she had been able to stay clean of drugs for periods of up to a year, she acknowledged that she would relapse "just out of depression or whatever emotional experience I was going through at the time," and she admitted relapsing most recently about the time of the July 2004 termination hearing. Only after that hearing did she start to address her mental health and drug dependency problems, and she could not explain why it took her from October 2001 until July 2004 to seek treatment. The psychological evaluation of the mother conducted by court order in September 2004 indicated that the mother had been hospitalized several times: the first time because she was dissociating, had entered a fugue state,[3] and was hearing voices; and the other times because she quit taking her medication (against doctors' orders) and began again experiencing hallucinations and dissociation. The evaluating psychologist testified that, in his opinion, "[h]aving the children back home to care for herself could prove quite stressful and possibly precipitate another psychotic break."
At the termination hearing, the father admitted to having been arrested "five or six" times. His home evaluation, however, showed a history of thirteen arrests, and he reported only two arrests to the evaluating psychologist. The father denied physically abusing his wife, but the mother testified to his abuse, asserting that once he had used a gun to hold her down, although she had made no report of this incident to the police. Although the father acknowledged that he understood the goals of his original December *259 2001 case plan, he admitted that he had not complied with the case plan goals, did not have a place for the children to live, and had not paid child support in the three years before the June 2004 hearing. The father's employment in the past years had been both temporary and sporadic. He had been fired from his part-time job with a tree service just before the June 2005 hearings. The father had apparently altered the handwritten amounts shown on his tree service pay envelopes in order to exaggerate his income. He had lived in the same home for 13 months at the time of the June 2005 termination hearings, but he was consistently behind on both rent and utility payments. A month after the termination hearings, the father was evicted from his home.
The child psychologist who evaluated the boys in May 2005 observed that all three boys had developed a strong bond with their current foster mother and her extended family. The boys all wanted to stay with her, and she wanted to adopt them. Although in earlier evaluations J.D.O. had been diagnosed with depression and L.D.O. with post-traumatic stress disorder, neither showed current signs of these disorders; and J.D.O.'s problems with uncontrolled outbursts of anger had greatly diminished since his placement with his current foster mother. The boys' foster mother also testified to the improvement in J.D.O.'s self-control. The child psychologist recommended that parental rights be terminated because of the parents' history of instability and mental health problems and their lack of progress since the Department became involved with the case in October 2001, and in order to allow the boys' current foster mother to adopt them. The CASA and the caseworkers also recommended that parental rights be terminated.
At the end of the final June 2005 termination hearing, the juvenile court ruled that the parental rights of the mother and father should be terminated. At the disposition hearing held in October 2005, after finding that no relatives qualified to take in the children were available, the court granted permanent custody to the Department. From this order the parents have brought their separate appeals. Raising two enumerations of error, appellants argue that there was insufficient evidence to support the termination of appellants' parental rights and that the Department's petition should have been dismissed because of the Department's delay in preparing a new reunification case plan following the July 2004 termination hearing.
1. Under OCGA § 15-11-94(a), a juvenile court must employ a two-prong test before terminating parental rights. First, the juvenile court must make a finding of "parental misconduct or inability," which is proved by clear and convincing evidence that the child is deprived; the deprivation is caused by a lack of proper parental care or control; the cause of the deprivation is likely to continue or will not likely be remedied; and continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[4] "If these four factors are satisfied, the court must then determine whether termination of parental rights is in the [children's] best interest, considering [their] physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home."[5]
(a) Parental misconduct or inability. Applying the four factors provided in OCGA § 15-11-94(b)(4)(A) to this case, we conclude that there is ample evidence to support the juvenile court's finding of parental misconduct or inability. Construing the evidence in the light most favorable to the juvenile court's findings, we address each of the four factors in turn.
(i) The children are deprived. Appellants are bound by the juvenile court's prior deprivation orders, which were never appealed.[6]
*260 (ii) Lack of parental care or control as a cause. The deprivation orders, combined with the parents' failure to comply with the first case plan, their failure to obtain stable housing, their continued financial instability, and their prolonged unwillingness to face their substance abuse problems, show that the parents' lack of parental care or control caused the children's deprivation.[7]
(iii) Lack of care or control likely to continue. Evidence of the parents' past conduct may be considered in determining whether the deprivation is likely to continue; the trial court is not bound by mere promises to do better in the future.[8] Here, the mother's fragile mental health, coupled with her unstable financial situation, showed that the mother would need substantial assistance in governing her finances and in meeting the stresses of having three adolescent boys under her sole care. "The test in determining termination of parental rights is whether the mother, ultimately standing alone, is capable of mastering and utilizing the necessary skills to meet her parenting obligations."[9] The father's continued inability to obtain steady employment or stable housing, his delay in addressing his drug problems, as well as his untruthfulness in altering his pay records, provided evidence that the lack of care or control was likely to continue. Under these circumstances, it was for the juvenile court to weigh the parents' claims of rehabilitation. "In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation."[10] Further, "[j]udging the credibility of the [parents'] good intentions was a task for the juvenile court."[11] On the record before us, there was sufficient clear and convincing evidence for the juvenile court to conclude that the lack of parental care or control was likely to continue.
(iv) Serious harm to the child. The same circumstances that authorized the juvenile court to determine, first, that the children were deprived due to lack of proper parental care and control and, second, that the deprivation was likely to continue, further provided clear and convincing evidentiary support for the conclusion that such "continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm" to the children.[12] Here, even though the parents attended visitations with their children, the evidence of the parents' prolonged failure to provide a stable home or income, their failure to remain drug-free, and their failure to take the steps necessary to reunite with their children was sufficient to satisfy this requirement. Further, "it is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems."[13] The juvenile court was authorized to consider the adverse effects of prolonged foster care,[14] as well as testimony as to the boys' need for a stable home.[15] Here, the record supports the juvenile court's conclusion that the children's continued *261 deprivation was likely to cause them serious harm.
Thus, the record before us supports by clear and convincing evidence the juvenile court's finding of parental misconduct or inability.
(b) Under the statutory scheme, once the juvenile court determines that there is clear and convincing evidence of parental misconduct or inability, the court must then determine whether termination of parental rights is in the children's best interests, "after considering the physical, mental, emotional, and moral condition and needs of the [children], including the need for a secure and stable home."[16] The evidence presented at the termination hearings and summarized above supports the juvenile court's conclusion that terminating the parents' parental rights was in the best interests of the children. "The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent[s'] rights would be in the [children's] best interest."[17] The record reflects the parents' inability, demonstrated over several years, to provide a stable home for the children. The children have been placed with a family willing to adopt them, and the psychologist who evaluated them testified to their need for a stable environment.[18] Here, the record supports the juvenile court's conclusion that termination of the parents' parental rights was in the children's best interests.
Because a rational trier of fact could have found clear and convincing evidence of the parents' misconduct or inability, and that termination of the parents' parental rights was in the best interests of the children, the juvenile court did not err in terminating the parents' rights as to T.W.O., L.D.O., and J.D.O.
2. Appellants further argue that they have been deprived of the opportunity to achieve reunification as contemplated in OCGA § 15-11-58(a)(2) because the Department did not promptly present a new reunification case plan after the juvenile court's order of January 13, 2005, implementing the court's ruling in the July 2004 termination hearing. OCGA § 15-11-58(a)(2)(B) provides in part that "reasonable efforts shall be made to preserve and reunify families . . . [t]o make it possible for a child to return safely to the child's home." Although we sympathize with appellants' contention that the Department's delay in issuing the new reunification plan has placed them at a disadvantage in resisting the petition for termination, we note nonetheless that the juvenile court found that the Department had made "significant and reasonable efforts" to return these children to their home, and this finding is supported by ample evidence in the record. Appellants' argument ignores the fact that a reunification case plan was prepared in December 2001 and was in effect for more than a year and a quarter, until March 2003. During that time, both the mother and the father failed to comply with the goals of the case plan: most importantly, obtaining adequate housing and financial stability, and dealing with their substance abuse problems. The parents' efforts to achieve compliance with the March 2005 reunification case plan are laudable; nonetheless, this Court must apply the two-prong test set forth in Division 1 above based on the entire history of the case from October 2001 to the time of the final termination hearing in June 2005.
Finally, neither the mother nor the father has cited authority for the proposition that a termination petition must be dismissed where preparation of a second reunification plan has been delayed. The mother's reliance on In the Interest of B.C.[19] is misplaced. In that case, no reunification plan had ever been put in place subsequent to the finding of deprivation, and only six weeks elapsed between the deprivation order and the filing of the termination petition.[20] In contrast, in the case before us now, the first reunification *262 plan was in effect for well over a year, during which time neither the mother nor the father was able to meet the case plan goals. Moreover, we note that the requirements of OCGA § 15-11-58 do not apply to termination proceedings, which are governed, as discussed above, by OCGA § 15-11-94(a).[21]
Judgment affirmed.
BLACKBURN, P.J., and ADAMS, J., concur.
NOTES
[1] (Footnotes omitted.) In the Interest of F.C., 248 Ga.App. 675, 549 S.E.2d 125 (2001).
[2] The parents divorced in April 2001. The father, alleging that the mother had become unfit to care for the boys due to her drug addiction, obtained custody that August.
[3] The psychologist described "dissociative fugue" as a type of amnesia, "when you don't know who you are."
[4] OCGA § 15-11-94(b)(4)(A) (i-iv); In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997); accord In the Interest of J.D., 280 Ga. App. 861, 862(1), 635 S.E.2d 226 (2006).
[5] (Footnote omitted.) In the Interest of H.E.M.O., 281 Ga.App. 281, 284-285(1), 636 S.E.2d 47 (2006); see OCGA § 15-11-94(a).
[6] In the Interest of C.F., 251 Ga.App. 708, 712(1)(a), 555 S.E.2d 81 (2001); accord In the Interest of C.T.M., 278 Ga.App. 297, 301(2)(a)(i), 628 S.E.2d 713 (2006).
[7] In the Interest of F.C., supra at 677-678(1), 549 S.E.2d 125; see also OCGA § 15-11-94(b)(4)(B) (factors to consider in determining whether the child is "without proper parental care and control" include the parent's mental health deficiency and/or the parent's drug abuse).
[8] In the Interest of A.B., 283 Ga.App. 131, 136(1)(c), 640 S.E.2d 702 (2006).
[9] (Citations and punctuation omitted; emphasis supplied.) In the Interest of T.P., 270 Ga.App. 700, 705(3), 608 S.E.2d 43 (2004).
[10] (Punctuation and footnote omitted.) In the Interest of A.T.H., 248 Ga.App. 570, 573(1), 547 S.E.2d 299 (2001); accord In the Interest of T.P., supra.
[11] (Citation and punctuation omitted.) In the Interest of A.B., supra, at 137(1)(c), 640 S.E.2d 702.
[12] OCGA § 15-11-94(b)(4)(A)(iv); see In the Interest of B.I.F., 264 Ga.App. 777, 780-781(1), 592 S.E.2d 441 (2003).
[13] (Footnote omitted.) In the Interest of B.I.F., supra at 781(1), 592 S.E.2d 441.
[14] See In the Interest of A.B., supra at 137(1)(d), 640 S.E.2d 702.
[15] In the Interest of B.I.F., supra (court may consider caseworker's testimony concerning child's need for permanency).
[16] OCGA § 15-11-94(a).
[17] (Citation and punctuation omitted.) In the Interest of A.B., supra at 138(2), 640 S.E.2d 702.
[18] See Id.,
[19] 250 Ga.App. 152, 550 S.E.2d 707 (2001).
[20] Id. at 155-156(1), 550 S.E.2d 707.
[21] In the Interest of F.C., supra at 679(2), 549 S.E.2d 125. OCGA § 15-11-58 imposes certain requirements upon findings of deprivation, but the parents here did not appeal the juvenile court's deprivation rulings. Id.