### A08A1701. IN THE INTEREST OF O. M. J., a child.
#### (676 SE2d 421)

BARNES, Judge.

The mother of O. M. J. appeals the order of the Juvenile Court of DeKalb County terminating her parental rights. In addition to contending that the trial court erred in finding clear and convincing evidence of present deprivation, and that the deprivation was likely to continue, the mother maintains that her counsel was ineffective and that the record was replete with omissions resulting in a procedurally flawed process. Upon review, we affirm.

> On appeal from a termination order, this Court views the evidence in the light most favorable to the Department and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost. We do not weigh the evidence or determine the credibility of witnesses, but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.

(Footnote omitted.) *In the Interest of T. W. O.*, 283 Ga. App. 771 (643 SE2d 255) (2007).

So viewed, the evidence shows that the DeKalb County Department of Family and Children Services ("DFACS") took then-newborn O. M. J. into custody in January 2006 after the mother did not honor her agreement with the hospital to stay with a friend upon her release from the hospital after giving birth. The mother had attempted suicide three times while pregnant, it was opined that she was not "mentally capable and stable enough" to care for the infant, and there was no family placement available for O. M. J. DFACS, thereafter, filed a deprivation petition, and on January 25, 2006, the juvenile court entered a 72-hour detentional hearing order finding O. M. J. deprived because the mother could not provide adequate care and supervision for the infant, and custody with the mother would be detrimental to O. M. J.'s welfare. The juvenile court appointed a lawyer and guardian ad litem to represent the mother.

A reunification case plan was developed for the mother on March 13, 2006 which required that she obtain and maintain housing and a

source of income, obtain childcare services, attend and complete parenting classes, participate in individual counseling, receive a psychological assessment and follow the recommendations, cooperate with a parent aide, and assure proper supervision of O. M. J. at all times. The guardian ad litem reported on May 15, 2006 that the "mother denied that she needs medication and that she is mentally unstable." She also reported that the mother had been hospitalized more than 30 times at Georgia Regional Hospital, and that "some of the admissions were voluntary and other were under a 1013 . . . due to [the mother's] need for immediate emergency medical care because she was a danger to herself and to the public."[1] The guardian ad litem recommended that DFACS maintain custody of O. M. J. while the mother received mental health treatment.

On March 26, 2006, following a hearing at which the mother was present and represented by counsel, the juvenile court found the child to be deprived because of the mother's mental illness, and entered a concurrent permanency plan of reunification or nonreunification with adoption. On July 10, 2006, the court entered a permanency plan review order in which it noted that the mother had completed parenting classes and had two negative drug screens, but had not secured stable housing, and had not enrolled in anger management classes.

On October 24, 2006, DFACS filed an "intake data sheet" requesting that custody of O. M. J. be extended for one year because of continued deprivation. Following a second permanency planning review hearing held on October 9, 2006, the juvenile court entered an order maintaining legal and physical custody of the child with DFACS, and finding that the permanency plan was now termination of parental rights. On November 9, 2006, DFACS filed a motion for an in-court review requesting that the case be set for an emergency hearing because of the mother's erratic behavior. It was noted in the petition that the mother's visits with the child were not going well because the mother "deteriorates after each visit and had to be 1013 on two occasions. Most recently the provider attempted to 1013 the mother on Wednesday, November 8, 2006, after a visit, due to her erratic behavior, but the mother left the facility before the police arrived."

The visitation report submitted from a clinical social worker from Pathways who worked with the mother included numerous instances of the mother's erratic and unstable behavior. On several occasions the mother appeared suicidal, often lamenting that she

---

[1] "1013" apparently refers to an Emergency Physician's Certificate authorizing an involuntary commitment.

"wanted to give up," "was tired," or could not "fight anymore." On one occasion, the social worker was so concerned she called police to meet her at the mother's home after the mother told her that she had taken old prescription medication to help her sleep, and that she "wanted to die." Although taken to Grady Hospital when police arrived, the mother left before getting treatment. On another occasion, the social worker visited the mother and found that she was

> actively hallucinating, telling me that her daughter had been with her the entire day and had told her to make some tuna fish. [The mother] was upset because she believed that someone from DFACS had entered her home through a window and taken [O. M. J.] out of the home on this day while she was making tuna fish. . . . [S]he continued to hallucinate and make references to her desire to die.

The mother was taken to DeKalb Medical Center to be evaluated, but left without receiving treatment. The social worker reported being very concerned about the mother's visits with the child, given her "psychosis and thoughts of harming herself and others" and opined that the mother was "not stable at this time."

The in-court review was held on November 14, 2006 after which the juvenile court ordered that the mother receive an "in-patient psychiatric evaluation . . . for a period of 27 days" at Georgia Regional Hospital. The juvenile court reserved ruling on the visitation issue. A permanency plan review hearing was held on December 8, 2006, after which the juvenile court entered an order finding that the mother had completed a psychological evaluation, and was continuing to work on her case plan goals. Visitation was also resumed, but limited to once a week.

On January 22, 2007, the juvenile court granted DFACS's petition for an extension of custody, and on March 14, 2007, DFACS filed a petition to terminate the mother's parental rights. The mother answered, and also filed a motion for partnership parenting, acknowledging that she had a "verifiable mental illness," but requesting that she be allowed to "enter into a contractual arrangement to share parenting" with a family friend.

At the June 4, 2007 termination hearing, the social services manager with DFACS testified that, although the mother had achieved some of her case plan goals, she could not complete her case plan goals of securing independent housing and independently parenting O. M. J. because of her mental illness. She further testified that the child would suffer if returned to the mother because of the mother's inability to put the child's needs first. The clinical social

worker at Pathways agreed that the mother failed to pick up cues from the child, and "any time the baby would cry or act agitated, [the mother] would become panicky. And that would lead to her own distress and anxiety."

A psychologist who evaluated the mother in March and August 2006 testified that the mother was diagnosed at 18 with borderline personality disorder and had received social security disability insurance since that time. She was in foster care from the ages of nine to eighteen, after running away because her mother's boyfriend had sexually abused her. Her mother was diagnosed with schizophrenia.

The psychologist also testified that the appellant had "over 300 psychiatric hospitalizations due to self-mutilation, suicide attempts, claiming that she was hearing voices, et cetera." He testified that "[b]orderline personality disorder . . . is so difficult to treat because it's a basic deficit and distortions in your basic personality structure and how you interact with people." He further testified that it could not be treated with medication, unlike other mental illnesses, and "one of the essential features here is where I love you now and I hate you tomorrow." He did not recommend reunification of the mother with O. M. J. because the mother lacked "the necessary cognitive resources to be a . . . parent to this child." The psychologist also opined that co-parenting, given the mother's mental illness which causes her to alienate the people involved in her life, "would be an absolute recipe for disaster for this baby" because

> [t]o move this baby into some kind of a hypothetical situation is an experiment that could be doom[ed] to failure, can also be dooming this baby to a lifetime of mental health and emotional and personality issues. It could be pushing this baby over the edge to a major attachment disorder, which could be associated in the future with drug abuse, poor school functioning, poor social functioning, other mental health problems, delinquency, et cetera.

At the time of the hearing the mother had been living in a housing program for approximately one year. Although O. M. J. could visit, the child was not allowed to stay at the facility. As a requirement of participating in the program, the mother had applied for a section 8 voucher, but it was unclear whether she would be able to obtain housing. The mother testified that there was a four-year waiting list for housing. The mother also testified that she was attending anger management classes, taking her prescribed medication, and was in therapy once a month. The mother acknowledged that she was not trying to "parent" O. M. J. or "bring her home with me," but that she "just want[ed] to stay in [her] daughter's life."

After hearing this testimony and taking judicial notice of its prior orders, the juvenile court orally granted the termination petition and authorized DFACS to pursue adoption for the child. In the July 30, 2007 written order terminating the mother's parental rights the juvenile court found that the mother was

> unable to provide a secure, stable and healthy environment for her child due to her unstable mental health [and] . . . has failed to establish and maintain independent stable housing and income. She is unable to adequately and independently parent and has failed to develop and maintain a familial bond with the child in a meaningful and supportive manner.

The mother appeals from that order.

The termination of parental rights under OCGA § 15-11-94 involves a two-prong analysis.

> In the first prong, the court must decide whether there is present clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-94 (a). Parental misconduct or inability, in turn, is proven by evidence showing: (1) that the child is deprived; (2) that lack of proper parental care or control is the cause of deprivation; (3) that the cause of deprivation is likely to continue or will not likely be remedied; and (4) that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94 (b) (4) (A). In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.

(Punctuation omitted.) *In the Interest of R. W.*, 248 Ga. App. 522, 523-524 (1) (546 SE2d 882) (2001).

1. The mother first complains that the termination must be reversed because the termination hearing transcript fails to identify speakers and the record is replete with omissions and mistakes.

(a) With regard to the termination hearing transcript, which fails to identify some of the speakers, the mother's "remedy is in the trial court, not the appellate court." *Epps v. State*, 168 Ga. App. 79, 80 (1) (308 SE2d 234) (1983).

> When a party to a trial states "the transcript or record does not truly or fully disclose what transpired in the trial court and the parties are unable to agree thereon, the trial court shall set the matter down for a hearing with notice to both

parties, and resolve the difference so as to make the record conform to the truth."

Id., OCGA § 5-6-41 (f); see *In the Interest of C. C. B.*, 188 Ga. App. 46 (1) (372 SE2d 6) (1988).

In this case, although the mother argues that she attempted to supplement the record by leaving a "message with the Clerk of Court . . . concerning the record sent to the appellate court," and was told the clerk would not supplement the record, she did not file a motion or seek a hearing pursuant to OCGA § 5-6-41 (f). Additionally, the documents attached to her brief that were not included in the record were all filed after the termination and involved visitation or attempts to expedite the termination hearing transcript, none of which is relevant to the issues before us.

(b) More importantly, with regard to omissions in the termination transcript, the absence of previous hearing transcripts, missing documents, and "un-filed" documents in the record, the mother has not specified how these issues have prejudiced her appeal. As discussed in Division 2, she is bound by the unappealed deprivation findings, and the trial court's determination of present unfitness was based on evidence presented at the termination hearing. Although some of the speakers at the termination hearing are not identified, the witnesses' testimony is clear through context and the mother does not argue that the identity of any specific speaker is critical to the issues on appeal.

The mother also does not argue that the trial court relied on missing evidence, as was the case in *In the Interest of D. S.*, 285 Ga. App. 752 (647 SE2d 417) (2007), and *In the Interest of D. P.*, 284 Ga. App. 453 (644 SE2d 299) (2007). In *D. S.*, only three people testified at the termination hearing, and two were relatives who had filed the petition. Some of the juvenile court's findings of fact in that case were not supported by any evidence in the record, such as the determination that the parents' mental or emotional health was verifiably deficient, and the order did not specify what prior evidence was considered. In *D. P.*, a deprivation case, the trial court based its finding of deprivation primarily on findings in the detention order, but a transcript of the hearing preceding that order was not included in the record. In this case, to the contrary, the evidence presented at the termination hearing was extensive. Additionally, the mother herself admitted she was incapable of taking care of the child and was not seeking to bring her home with her, but only wanted to "stay in her life."

(c) Finally, the mother argues that the trial court improperly limited her presentation of evidence by not allowing her witnesses to testify, and that her trial counsel was ineffective for failing to make

a legally sufficient proffer. The record shows that the juvenile court judge asked the mother at the termination hearing who her witnesses were and what evidence they would offer. She had five witnesses, and the court heard testimony from two of them. One was the resident manager who testified about the mother's current housing; another was a nurse who worked at Georgia Regional, knew the mother as a patient and friend, and thought the mother could parent her daughter with minimal assistance. Trial counsel proffered that two of the remaining witnesses were people who had known the mother for ten to eighteen years who would testify about their observations of her and the "big changes" she had made in her life, and the third witness was a woman who was willing to adopt the child and allow the mother to remain involved.[2]

DFACS objected to hearing testimony from these three witnesses at the termination hearing, arguing that they would more properly be heard at the dispositional hearing if the mother's parental rights were terminated. The court agreed, and the mother's counsel acquiesced. At the dispositional hearing, a witness testified for the mother that she would be willing to adopt the child, but had not pursued the matter with DFACS.

While the mother is entitled to introduce evidence and be heard on her own behalf, OCGA §§ 15-11-7 (a), 15-11-104, in this case she has not described in her appellate brief what the excluded witnesses would have said that would have related to the termination issues. Even if trial counsel had proffered the evidence with more specificity and appellate counsel had argued it, the mother admitted throughout the hearing that she was unable to parent the child alone and was not trying to take her home, but only wanted to remain part of the child's life. In light of that admission, we find no reversible error in the trial court's ruling regarding the mother's witnesses.

2. The mother also contends that the trial court erred in finding clear and convincing evidence of deprivation, and that the deprivation was likely to continue.

(a) Since the mother did not appeal the juvenile court's orders finding the child deprived, she is bound by that finding for purposes of the termination hearing. See *In the Interest of T. P.*, 270 Ga. App. 700, 704 (1) (608 SE2d 43) (2004).

(b) Evidence of the mother's past conduct may be considered in determining whether the deprivation is likely to continue. *In the Interest of M. R.*, 282 Ga. App. 91, 99 (1) (637 SE2d 743) (2006). Here, despite her good intentions, the mother has never successfully

---

[2] Because these witnesses were present and available to testify, trial counsel's proffer to the court was sufficient. See *Dickens v. State*, 280 Ga. 320, 323 (2), n. 3 (627 SE2d 587) (2006).

parented O. M. J. alone, and admittedly cannot do so. "The test in determining termination of parental rights is whether the mother, *ultimately standing alone*, is capable of mastering and utilizing the necessary skills to meet her parenting obligations." (Punctuation and footnote omitted; emphasis in original.) *In the Interest of T. W. O.,* supra 283 Ga. App. at 776 (1) (a) (iii). Here, there was more than clear and convincing evidence that the mother is simply not capable of fulfilling those obligations. One basis for seeking termination is "[a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-94 (b) (4) (B) (i).

The mother's failure to stabilize her mental illness, and her continued inability to obtain and maintain stable housing authorized the juvenile court to find that the cause of the deprivation is likely to continue. The record shows that the mother continues to struggle with her mental illness and that she admitted she would be unable to care for O. M. J. if she were returned to her. Ultimately, "the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court." (Citation and punctuation omitted.) *In the Interest of G. B.,* 263 Ga. App. 577, 583 (1) (588 SE2d 779) (2003).

The trial court did not err in finding that O. M. J.'s deprivation was likely to continue.

3. The mother last contends that her trial counsel was ineffective. Regarding this claim, no motion for new trial was filed on her behalf, so no claim of ineffective assistance of counsel was raised in the court below and this issue has not been ruled on. "It is axiomatic that a claim of ineffectiveness of trial counsel must be asserted at 'the earliest practicable moment.' " *Bailey v. State,* 264 Ga. 300 (443 SE2d 836) (1994). Here, however, trial counsel filed the notice of appeal, and appellate counsel was not appointed to the case until after the notice of appeal was filed. Thus, the instant appeal is the "earliest practicable moment" that appellate counsel could raise an ineffective assistance claim against trial counsel. However, "when the issue can be decided from the record on appeal, a remand to the trial court for a ruling on this issue would be 'wasteful of judicial and legal resources' and 'would serve no useful purpose.' " (Citations omitted.) *Forsman v. State,* 239 Ga. App. 612, 615 (8) (521 SE2d 410) (1999).

> In order to prevail on a claim of ineffective assistance of counsel the mother must show that her counsel's performance was deficient and that the deficient performance was

prejudicial to her defense. To meet the first prong of this test, the mother must overcome the strong presumption that counsel's performance fell within a wide range of professional conduct and that counsel's decisions were not made in the exercise of reasonable professional judgment.

(Citations and punctuation omitted.) *In the Interest of A. H. P.*, 232 Ga. App. 330, 334 (2) (500 SE2d 418) (1998).

Here, the mother complains that trial counsel was ineffective for failing to object to inadmissible evidence and hearsay testimony.

[E]ven if the juvenile court did consider hearsay, this will not constitute reversible error if the other evidence introduced at the termination hearing, excluding the hearsay, supports the juvenile court's findings and conclusions. Moreover, in a nonjury trial, we must presume that the court is able to select and consider the properly presented evidence and dismiss the remainder. This court will reverse the court below only if no legal evidence supports the lower court's ruling.

(Citations omitted.) *In the Interest of E. G.*, 284 Ga. App. 524, 531 (3) (644 SE2d 339) (2007).

Under these circumstances a rational trier of fact could have found that the mother's rights should be terminated, and sufficient legal evidence supports the ruling. Thus, we affirm the juvenile court's decision.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED MARCH 26, 2009

*Good & Lee, Darice M. Good, Hurl R. Taylor, Jr.*, for appellant.
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Virginia B. Fuller, Assistant Attorney General, Cynthia Roberts-Emory*, for appellee.