658 S.E.2d 403 (2008)
In the Interest of K.S., et al., children.
No. A07A2275.
Court of Appeals of Georgia.
February 27, 2008.
*404 Joshua D. Earwood, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Neel & Smith, B. Shane Haney, for appellee.
JOHNSON, Presiding Judge.
The mother of four-year-old twins K.S. and K.S. appeals from the juvenile court's termination of her parental rights.[1] She contends the judgment is against the weight of the evidence. We affirm.
In considering the mother's appeal, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the mother's right to custody should have been terminated.[2] We neither weigh the evidence nor determine the credibility of the witnesses, but instead defer to the juvenile court's findings of fact.[3]
Viewed in that light, the record shows that the Bartow County Department of Family and Children Services ("the department") became involved with the children in November 2004 because the parents were abusing methamphetamine. The children, who were one year old at the time, initially remained in their parents' custody while the department offered services to help the family.
In June 2005, the juvenile court issued a shelter care order because of the parents' ongoing methamphetamine use. The department placed the 23-month-old children in protective custody. Later that month, the department filed a deprivation petition. After a hearing, the court entered an order of deprivation. In it, the court noted that the mother stipulated that the children were deprived due to, among other things, the mother's mental health issues, thyroid condition, inadequate housing, unstable employment, and history of substance abuse. The mother also stipulated to the placement of the children in the custody of the department. The court approved reunification as the goal and directed the department to prepare a case plan.
The department developed a case plan for reunification which required the mother to become and remain drug-free, complete a substance abuse assessment and follow recommendations made thereto, submit to random drug screenings, and have six consecutive months of clean drug screens. The plan also required the mother to obtain and maintain safe and stable housing, obtain and maintain stable income, complete parenting classes, meet her own mental health needs, maintain a bond with the children by visiting them at least twice per month, pay child support of at least $45 per week, and cooperate with the department and all agencies providing services to her. The juvenile court entered an order in August 2005 incorporating the case plan.
A drug assessment in October 2005 recommended that the mother complete inpatient drug treatment. The mother entered an inpatient treatment program in January 2006, but left the program five days later against medical advice. She said she left early because *405 she felt isolated and had "some emotional issues," and because her doctor was not comfortable taking her off of or changing the mental health medication he had prescribed for her; she stated that she could not take her medications while in treatment. The mother's caseworker contacted the physician, who denied having talked to the mother about changing her medication. The mother missed the April 2006 meeting scheduled with the caseworker and doctor regarding the medications. A drug counselor later agreed to permit the mother to attend outpatient treatment. She began the treatment, but never completed it.
In April 2006, a citizen review panel recommended that the department pursue termination of the mother's parental rights. The court, however, entered an order approving reunification as the goal, and ordered the mother to receive a psychiatric evaluation and follow any recommendations related thereto.
In June 2006, the department filed a motion to extend its custody of the children. The juvenile court conducted a hearing and entered an order finding that the mother failed to complete drug treatment, maintain stable housing or employment, or pay child support. The court further found that she lived with her parents, who tested positive for drug use, even though she had been ordered not to. The juvenile court extended the department's custody, approved concurrent reunification and adoption as the permanent plan, and ordered the mother not to allow her parents or the children's father to have any contact with the children.
In August 2006, the mother was involved in a serious car accident and was hospitalized for multiple fractures. She was unable to care for herself when she was first released from the hospital in November 2006. The mother maintained that her parents helped her, but did not live with her. The parents took drug screens through June 2006, when the mother's mother failed a drug test. The parents took no more tests after that  despite the caseworker's admonition to the mother that anyone in the house needed to take drug tests  because the mother kept telling the caseworker that they did not live with her.
In November 2006, the department filed a petition to terminate the mother's parental rights. The petition alleged, among other things, that she wilfully failed and refused for over one year to complete the court-ordered case plan. A termination hearing was held in February 2007.
At the hearing, the mother testified that she no longer needed help caring for herself and that she lived alone. She said she understood that she was ordered not to live with her parents because of their drug abuse issues. The mother agreed that it was inappropriate for the children to be around her parents if they had drug issues. She acknowledged that her mother tested positive for marijuana use in 2004, and for hydrocodone at another time, but said they no longer have drug problems. A caseworker noted, however, that her mother tested positive for drugs in April 2006 and June 2006. The mother admitted that her parents stayed with her periodically, and later conceded that she had always lived with them. She also admitted that the children's father, who had a history of drug abuse, sometimes stayed with her, and that he and her father listed her address as their own when they were arrested for burglary in June 2006. The parents were present in the home during the case worker's visits in December 2006 and January 2007.
The mother testified that her parents paid her bills after the accident, paid her property taxes, bought her food with their food stamps, and paid for her medication when government assistance and other family members did not. She said she expected to start receiving Social Security disability benefits, though she provided no verification. The mother also stated that she was expecting insurance proceeds from the accident. Her mother was not working at the time of the hearing, and her father was collecting disability benefits.
The children's mother worked at a fast food restaurant from May 2006 until August 2006, but has worked less than one year in her entire life. She made one child support payment of $30 in August 2005, and made no *406 other payments during the remaining twenty months the children were in foster care. Her mother borrowed $5,000 and gave it to her, but the mother did not use any of the proceeds to pay child support. She added that her health has improved and she might be able to work.
The mother said she had remained drug-free, but admitted she did not complete any drug treatment program, though required by the case plan. She went to see a drug counselor in May 2006 until her accident in August 2006, and went to one group session in November 2006. She attended no drug counseling after her release from the hospital in November 2006. She only attended six Narcotics Anonymous meetings from November 2006 through the hearing in February 2007. She acknowledged that she needed to continue drug treatment, and that "drug treatment will be something I need the rest of my life." She stated that she has not received mental health counseling because she no longer has the mental health problems she had when she started treatment as a teenager. The mother admitted, however, that she still takes Xanax for anxiety. She also takes prescribed methadone for chronic pain; her prescription was recently increased from three to four times per day. The mother told the prescribing physician, who had been treating her since the accident, that she was worried about taking methadone for pain because she had a drug addiction. According to the mother, he replied that considering her drug addiction, methadone was the best medicine for her.
The physician who treated the mother from June 2001 until July 2006 testified that in January 2006 he prescribed the mother medication for anxiety, attention deficit disorder, and a thyroid condition. He added that he had no record of her asking him to change her medications for inpatient treatment. He stated that there are other drugs available for the treatment of her ADHD and anxiety.
The mother's caseworker expressed concern that the mother would have difficulty caring for the children since she has physical difficulties, such as the inability to lift her arm. The caseworker noted that one of the children has behavioral problems and has been in therapy for the past six months. The caseworker stated that the children have been with their foster parents, who are their paternal great uncle and aunt, since September 2005. The children and foster parents have bonded with one another, and have a very loving relationship. The foster parents want to adopt the children. She recommended that the mother's parental rights be terminated so the children could be adopted by the foster parents.
A therapist testified that he has treated one of the children since November 2006 for behavioral issues, and met with both children during seven therapy sessions. When the children were asked to identify their family, they consistently named the foster parents and another sibling. He observed the children interacting with the foster family and opined that they were very attached to each other. He added that the children did not often talk about the mother, and did not appear excited when she was mentioned. The children clung to their foster parents and did not want to sleep alone after visits with the mother. The therapist stated that permanency was important for the children to bond and attach, and they could be harmed if they did not achieve permanency. He testified that removing the children from the foster home would be harmful because of the bond they had with the family and based on the negative behavior they exhibited after visits with the mother.
Another caseworker noted having observed the children's close relationship with the foster parents. She saw the children's father at a visit after he was prohibited from having contact with them. A day care worker testified that as recently as a week before the termination hearing, the children bit themselves, kicked people, and banged their heads. They only exhibited this type of behavior after visits with the mother.
The guardian ad litem expressed concern about the mother's instability, opining that it would be harmful to return the children to her at present or to remove them from their foster home. The guardian deferred to the juvenile court on the issue of whether the *407 mother's parental rights should be terminated.
A contractor with Families and Children First, who supervised the mother's visits with the children for the four months preceding the hearing, testified that he "probably would" have concerns about the mother's ability to care for the three-year-olds in her current state but, if she continued to improve, he might not be concerned. He observed that the children were more comfortable and at ease with their foster parents, and were excited to see them after visits with the mother. The mother often made promises to the children about when they were coming home. He advised her to stop doing that because it upset the children.
In determining whether to terminate parental rights, courts must apply a two-part analysis.[4] First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (a) the child is deprived; (b) the lack of proper parental care or control is the cause of the deprivation; (c) the cause of the deprivation is likely to continue; and (d) continued deprivation is likely to cause serious mental, physical, emotional, or moral harm to the child.[5] If these four factors are present, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home.[6]
1. Parental misconduct or inability. There was clear and convincing evidence to support the juvenile court's finding of parental misconduct or inability.
(a) Deprivation. The mother stipulated that the children were deprived, and then failed to appeal the juvenile court's order finding the children deprived. The mother is therefore bound by that determination.[7]
(b) Lack of proper parental care or control as cause of deprivation. The mother also stipulated that the lack of proper parental care or control was the cause of the deprivation, and did not appeal the deprivation order citing the cause. The juvenile court's determination on this factor is binding as well.[8]
In any event, the evidence at the hearing supports such a finding. The mother never completed drug treatment as recommended in her assessment. She entered inpatient rehabilitation as recommended, but left days later against medical advice. She also failed to complete outpatient treatment. Upon her release from the hospital following the car accident, she failed to resume drug treatment. Excessive use of or a history of unrehabilitated abuse of dangerous drugs or controlled substances which renders the parent incapable of providing adequately for the needs of the child may show lack of parental care or control.[9]
And, as discussed above, there was evidence that she failed to comply with the court-ordered reunification plan for one year before the termination petition was filed.[10]
(c) Cause of deprivation likely to continue. There was clear and convincing evidence to demonstrate that the cause of the children's deprivation was likely to continue. The mother failed to comply with her case plans, especially the requirements to maintain a drug-free home, maintain stable income, pay child support, and not permit the children to have contact with their father and her parents. She also failed to actively pursue the avenues of treatment and counseling offered to her. These factors are relevant.[11]
(d) Continued deprivation likely to cause serious harm. The evidence clearly supports a finding that the deprivation is likely to *408 cause serious harm to the children. There was testimony that the children need permanence and to bond and attach to a stable caregiver, and that one child has behavioral problems.
Although some improvement in the mother's situation has occurred, judging the credibility of her good intentions was a task for the juvenile court.[12] The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.[13] Further, the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court.[14] Because a parent's conduct over the years is a better predictor of future conduct than a few months of partial stability, the juvenile court was authorized to infer from the evidence of past conduct that the improvements in the mother's situation were not sufficient to justify maintaining the children in limbo in hopes that the mother could, at some point in the indefinite future, provide an adequate home for the children.[15] The question is whether the mother, ultimately standing alone, can parent the children.[16]
2. Best interests of the children. The evidence presented at the hearing and discussed above supports the juvenile court's conclusion that terminating the mother's rights was in the best interests of the children. Those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the children's best interests.[17] Moreover, there was evidence that the children's visits with their mother were disturbing to them and that the children were doing well in the custody of their foster parents. There was also evidence that the children would benefit from the stability of remaining with their foster parents.[18] Any rational trier of fact could have found by clear and convincing evidence that the mother's parental rights should be terminated.[19]
Judgment affirmed.
PHIPPS and MIKELL, JJ., concur.
NOTES
[1] The father voluntarily relinquished his parental rights during the course of the termination proceeding, and is not a party to the appeal.
[2] In the Interest of K.N., 272 Ga.App. 45, 52, 611 S.E.2d 713 (2005).
[3] In the Interest of J.G.J.P., 268 Ga.App. 614, 602 S.E.2d 320 (2004).
[4] In the Interest of V.M.T., 243 Ga.App. 732, 735-736(3), 534 S.E.2d 452 (2000).
[5] Id.
[6] Id.; see also OCGA § 15-11-94(b)(4)(A).
[7] In the Interest of J.T.W., 270 Ga.App. 26, 33(2)(a), 606 S.E.2d 59 (2004).
[8] See In the Interest of K.N., supra.
[9] OCGA § 15-11-94(b)(4)(B)(ii).
[10] OCGA § 15-11-94(b)(4)(C).
[11] In the Interest of G.L.H., 209 Ga.App. 146, 150(2), 433 S.E.2d 357 (1993).
[12] In the Interest of C.J., 279 Ga.App. 213, 217, 630 S.E.2d 836 (2006).
[13] Id.
[14] Id.
[15] Id.
[16] In the Interest of T.W.O., 283 Ga.App. 771, 776, 643 S.E.2d 255 (2007)
[17] In the Interest of C.R.G., 272 Ga.App. 161, 164-165, 611 S.E.2d 784 (2005).
[18] See In the Interest of H.H., 257 Ga.App. 173, 176(1)(b), 570 S.E.2d 623 (2002).
[19] See generally In the Interest of C.A.W., 272 Ga.App. 4, 7, 611 S.E.2d 154 (2005).