A08A0004. IN THE INTEREST OF S. N. et al., children.

(662 SE2d 381)

JOHNSON, Presiding Judge.

The mother and father of sixteen-year-old S. N. and nine-year-old J. L. appeal the juvenile court's termination of their parental rights.[1] They argue that there was insufficient evidence to support the termination and that the court erred by not considering placing the children with the parents of the mother's ex-husband. Finding no error, we affirm.

In considering this appeal, we view the evidence in the light most favorable to the juvenile court's disposition. We determine whether any rational trier of fact could have found by clear and convincing evidence that the parents' rights to custody should have been terminated.[2] We do not weigh the evidence or evaluate witnesses' credibility, but instead defer to the juvenile court's findings of fact.[3]

So viewed, the record shows that the Peach County Department of Family and Children Services ("the department") first became involved with the mother in 2004, when it received reports of her drug usage. At that point, the department did not remove S. N. and J. L. from their mother's custody, but instead developed a case plan designed to ensure that the mother remained drug-free and that the children were properly supervised.[4] The mother and children entered a residential drug treatment program. In April 2005, however, the mother was expelled from the program for violating rules pertaining to prescription drug use. Because the mother had nowhere to live, the department took temporary custody of the children. The juvenile court entered an order finding the children to be deprived and granting custody to the department through April 2006. Neither parent appealed this order.

In May 2005, the department formulated a new case plan, later approved by the court, that was designed to reunify the parents with the children. The plan required the parents to complete drug and alcohol treatment programs, follow their treatment providers' recommendations, submit to — and test negative during — random

---

[1] The mother is the biological mother of both children. The father is the biological father of J. L., but not S. N. Although the father testified that he "claims" S. N. and is her "daddy," there is no evidence that he ever sought to adopt her. The biological father of S. N., whose whereabouts are unknown, was served by publication with notice of the termination proceedings, but he did not appear. His parental rights also were terminated, and he does not appeal.

[2] *In the Interest of K. S.*, 289 Ga. App. 782 (658 SE2d 403) (2008).

[3] Id.

[4] The record shows that the mother and father were then romantically involved, but not married. There is no evidence, however, as to the father's whereabouts or capacity for caring for the children at that time.

drug screens, complete parenting classes, obtain and maintain a source of income, and find stable, clean, safe housing.

By the date of their first judicial review in September 2005, neither parent was working on the case plan. All drug screens for both parents had been positive for methamphetamine, cocaine, or opiates; they had no housing of their own and were living with a friend; and although the mother was on her second job since losing custody of the children, the father was not working. The children, by contrast, were doing well in a family foster home. Accordingly, at the department's request, the court approved a new case plan that did not change the actions required of the parents, but incorporated a concurrent goal of placing the children for adoption.

As of the next judicial review in February 2006, the parents still had not completed the requirements of the case plan. The mother had recently been released from five months' incarceration on a probation violation, and the father was enrolled in a residential drug treatment program. They did not have housing, and they had refused to submit to drug screens. Nevertheless, they expressed a desire to complete the case plan, so the department recommended that they be given more time to do so. The court found that the parents could not care for the children, and it noted that the department would monitor the parents closely in the coming months to see if they began actively working the case plan. In May 2006, the court ordered that the children continue in the custody of the department through April 2007. The parents did not appeal the order.

By the date of the next judicial review in June 2006, both parents were working on the case plan. They had married; both had completed drug treatment programs; and their drug screens for the previous three months had all been negative. The father was employed. The couple still had no residence of their own, however, and the mother did not have a job. A court appointed special advocate ("CASA") reported that the children were doing well in school and "seemed to be happy" in their foster care placement. The department recommended, and the court approved, continuing with the case plan.

But by the next judicial review in December 2006, the parents' progress had reversed. They still lacked housing and adequate income. The mother was back in jail. The father was unemployed and planning to move to Virginia. The parents had not acceded to requests for drug screens, and they had failed to maintain regular contact with the department. The department announced its intention to petition for the termination of parental rights.

In January 2007, the department filed the termination petition. Pending a hearing on that petition, the court entered an order continuing the department's custody of the children. At that point,

the father had moved to Louisiana to find work. The mother was out of jail, living with friends, and working in a restaurant. Neither parent had submitted to any drug screens since May 2006.

The termination petition was heard in April 2007. Zelda Ashmon, the department's case manager, testified that the department wanted to terminate the parents' parental rights because they had not worked on the case plan since February 2006 and had been unable to maintain stable income or housing. According to Ashmon, the children had been in foster care for 24 months and needed permanence. The mother had tested positive for cocaine two months before. She was still working at the restaurant but had not provided the department with any proof of her income. The mother had not remained in contact with the department, and the department did not have her current address. The father was working in Louisiana and living with friends. He, too, had failed to submit proof of income to the department.

Ashmon testified that the parents visited the children only sporadically. Since moving to Louisiana, the father had seen the children only once. The mother had not visited the children during the six months before the hearing. The father had paid child support irregularly "[a]t one time," but had paid nothing recently, though he occasionally sent gifts and money to the children. The mother had sent nothing.

The children had been living with the same foster mother for two years, and Ashmon reported that they had bonded with her. Ashmon explained that the department had searched for a suitable relative placement, but had found none. The foster mother testified that she wanted to adopt the children. She also testified that both children had been behind academically when they came to her — six-year-old J. L. had not known his ABC's, for example — but she had worked with them and they were now performing well in school.

The CASA reported that the children were happy and stable in their foster home. J. L. was excelling in school, enjoyed extracurricular activities, liked his foster mother, and was agreeable to adoption. S. N. was also succeeding in academics and extracurricular activities. Although S. N. expressed a desire to live with her parents if possible, she liked her foster mother, did not want to be separated from her brother, and said that adoption would be "alright." She had had no contact with her mother "in a long time" until the day before the CASA visit, when she spoke to her mother on the telephone. According to the CASA, S. N. was unhappy about the phone call and reported that her mother had not seemed concerned about how she and her brother were doing.

The mother testified that she was living with her oldest daughter, who was eighteen and had a three-month-old baby. The mother

further testified that she had been working at a restaurant for five months, was on a waiting list for public housing, and planned to join the father in Louisiana as soon as her probation officer would allow her to leave the state of Georgia. She denied using cocaine, but could not explain her recent positive drug test result. She admitted having used methamphetamine nine months earlier. She stated that she would do whatever was necessary to keep her children, but she also wanted the department to consider placing them with her ex-husband's parents in Virginia.

The father testified that he had been drug-free for 17 months and was in the process of turning his life around. He further testified that the friend with whom he was living in Louisiana had offered to sell him a house so that his children could live with him. The father admitted that he was in arrears in child support payments for a third child.

After the hearing, the juvenile court ordered the termination of the parents' parental rights.

1. In deciding whether to terminate parental rights, courts apply a two-step analysis.

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[5]

Despite the parents' argument to the contrary, clear and convincing evidence supported termination in this case.

(a) *Parental misconduct or inability.* The parents did not appeal the juvenile court's prior orders finding that the children were deprived due to a lack of proper parental care and control. Thus, they are bound by those findings.[6]

With respect to whether the cause of the deprivation was likely to continue, the department presented ample evidence at the hearing that it would. In the nearly two-year period since the reunification

---

[5] (Footnotes omitted.) *In the Interest of C. A. S.*, 291 Ga. App. 204, 206 (661 SE2d 612) (2008); see also OCGA § 15-11-94 (b) (4) (A).

[6] See *In the Interest of K. N.*, 272 Ga. App. 45, 52 (a) (1), (2) (611 SE2d 713) (2005).

case plan was established, the parents had not obtained suitable housing, held steady jobs, or demonstrated adequate income. They had not taken parenting classes.[7] Although both had completed drug treatment programs, they had not submitted consistently to required drug screens, the mother's most recent screen had been positive for cocaine, and she had admitted using methamphetamine within the previous year. Thus, there was evidence of the mother's ongoing drug problems. Moreover, there was evidence that neither parent maintained regular contact with the children or contributed meaningfully to their support.

The parents argue that they were making progress on the case plan and expected to be able to provide a good home for their children in the near future. But the court may properly consider a parent's past conduct in determining whether the cause of a child's deprivation is likely to continue.[8] And although the parents' desire to — in the father's words — "do the right thing" is laudable, "the decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."[9] The juvenile court was entitled to discount the credibility of the parents' good intentions[10] and to find that the parents' conduct over the years was a better predictor of their future conduct than a few months of partial stability.[11] Notwithstanding their spotty efforts to meet some of the case plan requirements, the evidence authorized the court's conclusion that the cause of the children's deprivation was likely to continue.

The same evidence showing that the children's deprivation was likely to continue also supported the court's finding that continued deprivation would cause the children serious physical, mental, or moral harm.[12] Moreover,

> [e]vidence that the [parents] failed to take the steps necessary for reunification, that the foster parents have provided the child[ren] with a stable and secure home, and that they want to adopt the child[ren] will support a finding that the child[ren] will be harmed by further deprivation.[13]

---

[7] Although the parents claimed that they had been told they could skip the parenting classes, Ashmon reported that she was "not aware" of any such waiver.

[8] *In the Interest of R. S. H.*, 269 Ga. App. 292, 297 (a) (603 SE2d 675) (2004); *In the Interest of C. B. H.*, 262 Ga. App. 833, 836 (1) (586 SE2d 678) (2003).

[9] (Citation and punctuation omitted.) *In the Interest of D. I. W.*, 215 Ga. App. 644, 646 (1) (451 SE2d 804) (1994).

[10] See *In the Interest of R. S. H.*, supra.

[11] See *In the Interest of C. J.*, 279 Ga. App. 213, 217 (1) (630 SE2d 836) (2006).

[12] See *In the Interest of D. S.*, 247 Ga. App. 569, 573 (545 SE2d 1) (2001).

[13] *In the Interest of D. L. T.*, 283 Ga. App. 223, 228 (2) (641 SE2d 236) (2007).

Here, there was evidence that S. N. and J. L. had bonded with their foster mother, had overcome academic deficits to perform well in school, and were leading full, happy, stable lives. This evidence was sufficient for the juvenile court to conclude that continued deprivation would harm the children.[14]

(b) *Best interests of the children.* As discussed above, the evidence showed that the children were benefitting from the stability and security of their foster home. They had bonded with the foster mother, and she wanted to adopt them. The parents, on the other hand, had maintained only intermittent contact with the children. On the rare occasions when she did have contact with her mother, S. N. seemed disturbed afterward. Based on this evidence, a rational trier of fact could have found by clear and convincing evidence that termination of the parents' parental rights would be in the best interests of the children.[15]

2. The parents also contend that the juvenile court erred by not considering placing the children with the mother's ex-husband's parents, who live in Virginia. The court ruled that the department had made a "diligent and exhaustive," though ultimately fruitless, search for suitable relatives with whom to place the children. The court concluded that the mother's former in-laws were not a suitable placement because they were not blood relatives of the children, they did not know the children, and the children did not know them.

Under OCGA § 15-11-103 (a) (1), if after a termination of parental rights there remains no parent with parental rights, the court "shall first attempt to place the child with a person related to the child by blood or marriage or with a member of the child's extended family" if such person is willing and qualified and "the court determines such placement is the most appropriate for and in the best interest of the child." We review for abuse of discretion a juvenile court's determinations regarding the availability and suitability of a relative placement.[16] Here, the court's rejection of a placement with the mother's former in-laws on the grounds that those individuals had no relationship with the children, biological or otherwise, was not an abuse of discretion.

*Judgment affirmed. Barnes, C. J., and Phipps, J., concur.*

DECIDED MAY 22, 2008.

---

[14] See *In the Interest of C. J.*, supra.

[15] See *In the Interest of K. S.*, supra.

[16] See *In the Interest of A. A.*, 290 Ga. App. 818 (660 SE2d 868) (2008); *In the Interest of L. W.*, 276 Ga. App. 197, 202 (4) (622 SE2d 860) (2005).

*Robert M. Bearden, Jr.*, for appellants.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Virginia B. Fuller, Assistant Attorney General, W. Ashley Hawkins*, for appellee.