664 S.E.2d 848 (2008)
In the Interest of D.B.C. et al., children.
In the Interest of C.B. et al., children.
Nos. A08A0241, A08A0242.
Court of Appeals of Georgia.
July 7, 2008.
*850 Timothy Jack Crouch, for appellant (case no. A08A0241).
William H. Newton III, Miami, FL, for appellant (case no. A08A0242).
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Sr. Asst. Atty. Gen., Elizabeth M. Williamson, Asst. Atty. Gen., William A. O'Dell, for appellee.
ADAMS, Judge.
The father of twin daughters D.B.C. and D.B.C. appeals the order of the juvenile court terminating his parental rights, and their mother appeals the termination of her parental rights in the two children and a third child, C.B. We affirm.
In considering these appeals, this Court views the evidence in the light most favorable to the juvenile court's disposition and determines whether any rational trier of fact could have found by clear and convincing evidence that the appellants' parental rights should have been terminated. In the Interest of K.S., 289 Ga.App. 782, 658 S.E.2d 403 (2008). Moreover, this Court "neither weigh[s] the evidence nor determine[s] the credibility of the witnesses, but instead defer[s] to the juvenile court's findings of fact." (Footnote omitted.) Id.
The Department of Family and Children Services took D.B.C., D.B.C. and C.B. into care on April 16, 2004. The stated reasons for this action were the mother's open child protective services case, her unstable housing and income and her history of drug use. Both the twins' father and the father of C.B. were in jail at the time,[1] and the twins' father had not yet filed a petition to legitimate them. The Department filed a deprivation petition on April 23, 2004, and all three children were found to be deprived on the grounds of domestic violence, economic and residential instability, poor parenting skills, incarceration of the fathers, and the parents' drug abuse. Neither the mother nor the fathers appealed that order.
The Department developed a reunification case plan for the mother and the twins' father. The plan required the parents to obtain stable employment and housing; attend and successfully complete parenting classes; cooperate with the parent aide/family services worker; obtain a substance abuse assessment and successfully complete treatment; submit to random drug screens; resolve all criminal matters; and attend and successfully complete a psychological evaluation and follow all recommendations. In addition, the father was required to demonstrate appropriate methods of expression and discipline for the children and to complete anger management classes. The twins' father filed a petition to legitimate his children on May 11, 2004, which was granted on June 15, 2004.
*851 On March 14, 2005, the Department filed another complaint in connection with the children, which asserted a lack of compliance with the goals of the case plan in that the father had failed to maintain stable housing, complete an anger management course, or complete a psychological assessment. Similarly, the complaint alleged that the mother had failed to obtain drug treatment, take parenting classes, obtain a psychological assessment, maintain regular contact with the Department and the children, or maintain stable housing. The Department filed a motion for extension of custody on these grounds, which the juvenile court granted. A citizen review panel met on two occasions to consider the parents' progress and determined on both occasions that they had not completed the goals of their case plan. The review panel's second report noted that the parents believed that they had completed all parts of the case plan that they could accomplish on their own and that the Department was not following through on its obligations under the plan.
In November 2006, the Department filed a petition to terminate parental rights. The trial court held hearings in the matter on February 20, February 22 and April 12, 2007. At the hearing, Danette Hill, a caseworker for the Department in Floyd County, testified that the mother had been the subject of numerous child protective service complaints over roughly a four-year period due to her drug use, domestic violence issues and inadequate supervision. Hill described the parents' initial case plan goals, as listed above, and stated that the subsequent case plans had essentially the same goals. She could identify only one goal completed by the mother, which was parenting classes, and noted that the father had completed his goal of resolving his legal issues as he was no longer on probation. Additional evidence showed that he had also completed a parenting class. Hill said that although the parents took some steps toward accomplishing other goals, they had not completed them.
The mother was employed at "scattered jobs" during the period, but failed to maintain consistent employment and was unable to obtain stable housing. She resided at 17 separate residences between April 2004 and the time of the hearing. The mother stopped and started drug rehabilitation programs, but never finished them. The initial case plan required that she enter an inpatient program. She decided to attend an outpatient program instead but was expelled from that program and never returned. She subsequently entered an inpatient program on two occasions but checked herself out both times within a few days, against medical advice. When she entered the program a third time, she was discharged for smoking in her room and is not allowed to return. In addition, the mother appeared for only twenty-six of the thirty drug screens requested by the Department; she tested positive on seven occasions, refused to submit to two drug screens and tested negative nineteen times. Hill conceded, however, that at least four of these drug screens were marked as positive due to the mother's failure to appear for a scheduled test, in accordance with Department policy. Moreover, Hill was unaware that the mother had paid any child support for her children, and noted that she failed to attend some of her child support hearings. She attended only 46 of the 93 visits the Department scheduled with the children and gave no reason for her absence on 33 of those missed visits. On one visit, she and the father appeared smelling of alcohol.
The father was incarcerated at the time the Department took custody of the children and since worked on and off, but he was only able to provide pay stubs for a few months at one company. In addition, he lived at 16 separate residences, including jail, between April 2004 and the time of the hearing, and therefore failed to provide stable housing for the children. The father also failed to obtain the recommended psychiatric evaluation, although there was some evidence that he had contacted the psychiatric evaluation service. The father did submit to a psychological evaluation, after which further counseling was recommended to address anger and domestic violence issues. The father failed, however, to attend a domestic violence program as ordered by the juvenile court or to complete the required anger management classes. He also failed to provide proof that he had attended the recommended Alcoholics *852 Anonymous or other similar sessions. The father submitted to eight out of ten requested drug/alcohol screenings, refusing the other two. He tested negative on seven of the tests and positive for alcohol on one screening two months before the termination hearing. The father attended only 36 of the 94 offered visits with the children. He missed 17 visits due to his incarceration or other proffered excuses, and missed 36 times without giving any reason. Although a Tennessee court ordered the father to pay $300 per week in child support, Hill was aware of only one $15 payment made by the father.
Hill testified that the children had been residing with the father's sister, Kimberly Hicks, in Tennessee for over two years, since September 2004. Even though Hicks is not related to C.B., she and her husband took the necessary steps to become foster parents so that C.B. could be placed in their home and the children could be together.
Kimberly Hicks testified that the children had adapted well in her home. She said she loved the children very much and wished to adopt them. When they first came to her house, one of the twins had ear infections, and both underwent treatment for their ears. The twins also had trouble talking and had been involved in speech therapy for one and one half years. Additionally, one of the twins was diagnosed by two evaluators with attention deficit hyperactivity disorder (ADHD), and they were working with her on that. Hicks said that C.B. had special needs, and had been diagnosed with ADHD, with a bipolar tendency. He also has oppositional defiant disorder and obsessive compulsive disorder, and had been on medication and undergoing counseling to treat these conditions for almost two years. She said C.B. was doing well in counseling and all the children were doing extremely well in school.
Mike Nolley, a caseworker for the Department in Heard County, testified that the parents had been living in Heard County for four to five months prior to the hearing. Each parent had an assessment at a mental health center in Heard County. It was recommended that the mother complete three months of substance abuse classes, and she had attended five sessions at the time of the hearing. The mental health center suggested that the father attend Alcoholics Anonymous meetings and domestic violence classes. He attended two domestic violence classes, but later was dismissed from the program for missing too many classes, although he told Nolley he was seeking an alternative program. The mother provided one or two paychecks, which showed that she worked only eight or ten hours per week. Since then, she only provided information about her attempts to seek employment. Shortly after moving to Heard County, the father provided one pay check and one pay stub showing employment with a roofing company. He had worked odd jobs since and had provided no other employment verification. The parents' first residence in Heard County was deemed inappropriate due to one of the residents' drug use. At the time of the hearing, they resided in a mobile home park in Heard County, and Nolley said that they kept their trailer clean.
Lee Bennett, a clinical psychologist and wrap-around counselor for the parents, testified that he worked with them from December 2005 to August 2006 on parenting skills and substance abuse issues. Additionally, he worked with the father on anger management issues. Bennett said the parents were initially receptive and open, and the mother was very attentive and cooperative. But over time the father began to express more frustration with the process, hampering Bennett's ability to make progress in his sessions with them. Moreover, the father did not take responsibility for his situation and tended to blame everyone else for his problems. In July or August 2006 when the father learned that he would need to take a domestic violence class in addition to the anger management sessions with Bennett, he became angry and called to tell Bennett he was "fired." Neither parent sought additional sessions with Bennett.
Dr. Richard Hark, the clinical psychologist who performed evaluations on the parents, testified based upon his sessions with them and tests he performed. Dr. Hark opined that the father was "very dis-inhibited, very hypomanic," which he explained meant that the father had an "[in]ordinate *853 amount of energy that he doesn't control." He said the father had a very low tolerance for frustration, which caused him to be "quickly angered, very explosive . . . [including] outbursts both physical and verbal." In addition, he tended to rationalize these issues and blame others. He also believed that the father would become easily bored and irritated with the routine aspects of child rearing, and would anger quickly at ordinary childhood mishaps. Dr. Hark concluded that the father "would parent erratically and with much impatience," and he diagnosed the father with mood and personality disorders, with antisocial traits.
Dr. Hark diagnosed the mother with a character disorder with antisocial traits, a personality disorder and a passive/aggressive personality with paranoid traits. He described her as "rebellious" and resentful of authority. He said she has a propensity to use drugs and alcohol, so was very likely to relapse and believed that she would not maintain a routine in her home nor discipline consistently. He described the mother as very demanding and argumentative, and her cohabitation with the father was like putting "gasoline and fire together." He said they would require marital therapy.
Dr. John Azar-Dickens, a licensed clinical psychologist, who specializes in bonding assessments between children and adults testified that he observed the interactions between the children and their parents and foster parents. He concluded that the children had "an ambivalent or an anxious attachment" to the parents and a more stable and secure attachment to foster parents. He said that even if the parents achieved their plan goals, there would be a danger in breaking the attachment the children had with their foster parents. It could prove emotionally harmful to the children.
The parents testified on the last day of the hearing. The mother said that she had gotten a job one week after the termination hearings began and had been employed for about six weeks, working full-time at an hourly wage of $7.50. She and the father live in a three-bedroom trailer with room for the children. The mother stated that she had completed two parenting classes. She also said that she had completed a six-week substance abuse program through Heard County, despite Nolley's testimony that the recommendation was for a three-month course. The mother said that she had a very loving relationship with her children, although she missed some initial visits with them because she did not have adequate transportation. She now has unsupervised eight-hour visits and has been consistent in visiting them. She missed her two visits in January 2007, however, because "there was a little bit of confusion with all this going on, trying to get set up in a new place, worrying about the circumstances of having a home, having a job and trying to get [her] children back." The mother also acknowledged that at one point, the frequency of her visits with the children had been reduced because the father smelled of alcohol at one visit. Her children had not visited with her in her home, however, because it was too far for the time allotted, and she had not requested overnight visits due to "all that's going on."
The mother said she would be willing to take her children to all necessary doctor and counseling visits and would administer the required medications. She also believed that she had completed all aspects of her case plan other than being in her home for six months and would do anything she had to for her children. She admitted that she had made mistakes with the children in the past, but said that if given the chance, she would provide stability for her children.
The mother denied living in seventeen separate residences over a three-year period, but admitted that she had lived in numerous places over that time. She said they had moved from Floyd County, in violation of a court order, because the Department's requirements had prevented the father from holding down a job. He had missed work to attend anger management classes, and his employer was not happy.
The mother admitted that she had substance abuse problems but believed she had overcome her addiction. She explained that she dropped out of her rehabilitation program because she had a lot of questions about her case plan, could not reach someone to discuss them and thus was "just a nervous *854 wreck." She said that smoking in her room was "an accident." The mother described her court-ordered child support as "all messed up" because there were orders from several jurisdictions. She asserted that nobody really understood her child support obligations. But at one point she learned that she owed hundreds of dollars in back support. She said she had paid a total of about $500 over the three-year period, which included a $70 payment "a couple of months ago" and the proceeds of an income tax refund which the State applied to her outstanding child support obligation.
The father testified that he had been employed at a roofing company for about six weeks. He had worked there before, but he was fired after the Department called to ask his employer questions. He was earning $15 per hour but was looking for other work. He said he had been offered a couple of jobs, but his employers told him that he needed to "get done" with his personal problems first. He denied that his prior criminal history had affected his prospects for work, even though he had been arrested a number of times since August 1988 for various charges. He pled guilty to a charge of terroristic threats in 2002 and has three DUI convictions, as well as a conviction for driving on a suspended license. He was charged with simple battery in 2002 and vandalism in 2003, but the charges were dismissed. He also spent some time in jail for probation violations. The father admitted that he appeared in juvenile court in December 2006 while intoxicated and ended up going to jail for five days. Nevertheless, he insisted that it was not his criminal history that affected his employment; it was that "[e]mployers don't like to deal with Child Services."
The father stated that he had completed about eleven months of anger management classes, eight months with Bennett alone, and did not understand when he was told that he also had to complete a domestic violence class. Nevertheless, he met with someone to arrange a domestic violence counseling schedule. Although he had started two domestic violence programs, he quit one because he did not "like the way the gentleman talked to [him]" and had attended only one or two sessions of the other class over a two-month period. In addition, the father said he had attended AA meetings in the past, until the "issue was dropped." He acknowledged, however, that the issue "started back up again" after he came to court intoxicated. But he said that he had not found any meetings he "wanted to go to" in Heard County in the four intervening months.
After his release from prison, the father maintained visits with his children in Tennessee, but he began to miss visits after he and his sister began to have disagreements. He asked the Department to arrange meetings with the twins elsewhere. He stated that he missed his visitation in January 2007 because of moving and work issues, and had missed additional visits in February and March due to work conflicts. Although he had been ordered to pay $300 per month in child support, he said he was confused because "one minute, the case has been dropped. The next minute, it's started up again." But he estimated that he had paid somewhere between $800 and $1,000 toward his daughters' support over the last three years.
Each parent contends on appeal that the evidence was insufficient to support the juvenile court's order terminating their parental rights. Courts apply a two-part analysis in considering whether to terminate parental rights:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Footnotes omitted.) In the Interest of V.M.T., 243 Ga.App. 732, 735-736(3), 534 S.E.2d 452 (2000). See also OCGA § 15-11-94(b)(4)(A).
*855 1. Parental Misconduct or Inability. After reviewing the record and considering the statutory factors, we conclude, for the reasons set forth below, that there was clear and convincing evidence to support the juvenile court's finding of parental misconduct or inability.
(a) Deprivation  The juvenile court issued orders in 2004 and 2006 finding the children to be deprived, and neither parent appealed these orders. Accordingly, they are bound by the finding of deprivation for purposes of their termination proceedings. In the Interest of A.B., 283 Ga.App. 131, 136(1)(a), 640 S.E.2d 702 (2006).
(b) Deprivation Caused by Lack of Proper Parental Control or Misconduct  Similarly, "[t]he failure to appeal the deprivation order[s] renders the juvenile court's determination on this second factor binding as well." (Citation and punctuation omitted.) In the Interest of M.C., 287 Ga.App. 766, 768(b), 653 S.E.2d 120 (2007). In any event, the evidence presented at the hearing clearly supports the trial court's finding in the termination order that the deprivation was caused by lack of proper parental control or misconduct. The trial court based that conclusion upon a finding of (1) a medically verifiable deficiency of the parents' physical, mental or emotional health of such duration or nature as to render the parent unable to provide adequately for their children, OCGA § 15-11-94(b)(4)(B)(i), as well as a finding that (2) the parents had failed, without justifiable cause, for a period of one year to communicate with the children in a meaningful, supportive or parental manner, to provide care and support to the children or to comply with the case plan for a period of one year. OCGA § 15-11-94(b)(4)(C). In addition, the juvenile court found physical, mental, and emotional neglect of the children on the part of the father. OCGA § 15-11-94(b)(4)(B)(v).
Dr. Hark's testimony clearly supported the juvenile court's conclusion that a medically verifiable deficiency existed in the parents' physical, mental or emotional health, which impacted their ability to care for their children. Clear and convincing evidence also supported the trial court's findings that the father had neglected the children and that both parents had failed to meaningfully communicate with the children. The parents' record of visitation with their children was inconsistent, as they both missed a number of scheduled visits without excuse. Consequently, Dr. Azar-Dickens concluded that the children had only an ambivalent or anxious attachment to their parents.
Moreover, neither the mother nor the father had met their child support obligations. The mother made only one voluntary payment of $70 over a three-year period, and the father paid at most three and one-half months of his child support obligation. "Georgia law requires a parent to financially support his or her child while the child is in foster care, even in the absence of a court order and even if unable to earn income." (Citation omitted.) In the Interest of A.R.A.S., 278 Ga.App. 608, 613(2)(c), 629 S.E.2d 822 (2006).
Further, the evidence clearly showed that the parents had failed to comply with their case plan. The mother failed for more than three years to complete the recommended treatment. Moreover, Dr. Hark testified that the mother had a propensity to use drugs and alcohol and would be likely to relapse if she did not acknowledge her problem and get the proper treatment. The father also failed to attend AA meetings, and did not complete the requisite anger management and domestic violence courses. Both the mother and the father also failed to meet their goals of maintaining consistent employment and a stable home environment.
(c) Deprivation Likely to Continue  Although the parents had made some recent strides in completing their case plan goals, those accomplishments followed almost three years of inconsistent performance. "The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Citation and punctuation omitted.) In the Interest of J.D., 280 Ga.App. 861, 865(1)(c), 635 S.E.2d 226 (2006).
In considering the evidence presented at the hearing, we note that

*856 [a]lthough it is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue, it is equally true that evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required. However, in considering past deprivations compared to present achievements, juvenile courts are entitled to assign much less weight to such assertions of sudden parental fitness when compared to the other evidence.
(Citation and punctuation omitted; emphasis in original.) In the Interest of M.C., 287 Ga.App. at 768-769(c), 653 S.E.2d 120. "In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Citation and punctuation omitted.) In the Interest of M.N.R., 282 Ga.App. 46, 47, 637 S.E.2d 777 (2006). And we find that clear and convincing evidence supports the juvenile court's conclusion that the deprivation is likely to continue.
(d) Continued Deprivation Likely To Cause Harm  "The same evidence demonstrating that the children's deprivation is likely to continue also supports a finding that continued deprivation would cause serious physical, mental, or moral harm to the children." (Citation omitted.) In the Interest of R.S.H., 269 Ga.App. 292, 298(a), 603 S.E.2d 675 (2004). The parents' demonstrated inability to provide a stable home for the children or to provide for their needs could clearly result in harm. "[I]t is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems." (Footnote omitted.) In the Interest of B.I.F., 264 Ga.App. 777, 781(1), 592 S.E.2d 441 (2003). The evidence, therefore, clearly supported the trial court's finding on this factor.
2. Best Interests of Children  Having found clear and convincing evidence to support the juvenile court's finding of parental misconduct or inability, we now consider the best interests of the children. "To determine whether termination of parental rights is in the best interest of the child, the court shall consider the physical, mental, emotional, and moral condition and needs of the child, including his or her need for a secure and stable home." (Footnote omitted.) In the Interest of K.A.C., 290 Ga.App. 310, 314(5), 659 S.E.2d 703 (2008).
Thus "[t]he juvenile court was authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care." (Citation and punctuation omitted.) In the Interest of T.J., 281 Ga.App. 673, 676(1), 637 S.E.2d 75 (2006). The children have been in the Department's custody since April 2004. In the interim, the parents have been unable to provide the permanency, stability, and support needed by the children. The children have bonded with their foster parents, who wish to adopt them, who have given them a stable home, and who have provided for the children's specialized medical needs. Dr. Azar-Dickens opined that breaking the children's attachment to their foster parents could prove emotionally harmful to them. Accordingly, the juvenile court's determination that termination was in the children's best interests was also supported by clear and convincing evidence.
Judgment affirmed.
SMITH, P.J., and MIKELL, J., concur.
NOTES
[1] C.B.'s father remained in prison at the time of the hearing, and he is not a party to this appeal. Thus, the twins' father hereinafter will be referred to primarily as "the father."