**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**August 19, 2013**

# In the Court of Appeals of Georgia

A13A0883. IN THE INTEREST OF D. L. T. et al., children.

RAY, Judge.

Tim and Tammy Blankenship appeal from the juvenile court's dispositional order placing two minor children, D. L. T. and H. S. B., in the permanent custody of the Paulding County Department of Family and Children Services ("DFACS") preparatory to their adoption by their foster parents. The Blankenships are the paternal grandparents of H. S. B., but have no biological relationship with D. L. T., who is H. S. B.'s half-brother. On appeal, the Blankenships argue that the juvenile court abused its discretion in refusing to place the children with them after DFACS allegedly promised to do so if they completed certain requirements. For the reasons that follow, we affirm.

On October 21, 2010, the juvenile court ordered shelter care for D. L. T. and for H. S. B. The children's mother had been arrested four days earlier after attacking the Blankenships' son, Justin Blankenship, who is the putative father of H. S. B. The mother also had threatened to kill herself and the children.

In a December 17, 2010, order, the juvenile court found that while in the mother's care, D. L. T. had been locked in a room and left to play with his own feces, and that Tammy Blankenship knew about this incident. The juvenile court found that the children were deprived, and they were placed with Tim and Tammy Blankenship for five or six weeks. During that time, Tammy Blankenship contacted DFACS three times within a week to say she was having a hard time handling the children and was exhausted. She asked if only D. L. T. could be removed. DFACS informed her that they believed it was in the children's best interest to keep the siblings together. Before DFACS had time to arrange for daycare services or other help, Tammy Blankenship asked that both children be removed. They were removed in November 2010, and since then have lived with the foster parents who wish to adopt them. During part of the time the children have been in foster care, Tim and Tammy Blankenship had visitation.

On July 12, 2012, DFACS petitioned to terminate the rights of D. L. T.'s and H. S. B.'s biological parents, and Tim and Tammy Blankenship intervened, seeking to have both children placed in their custody. After the children's biological parents voluntarily surrendered all parental rights, the children were placed in DFACS' custody over the objection of Tim and Tammy Blankenship. The Blankenships appeal.

OCGA § 15-11-103 (a) provides that

Upon the entering of an order terminating the parental rights of a parent, a placement may be made only if the court finds that such placement is in the best interest of the child and in accordance with the child's court approved permanency plan pursuant to Code Section 15-11-58. In determining which placement is in the child's best interest, the court shall enter findings of fact reflecting its consideration of the following: (1) The child's need for a placement that offers the greatest degree of legal permanence and security; (2) The least disruptive placement alternative for the child; (3) The child's sense of attachment and need for continuity of relationships; and (4) Any other factors the court deems relevant to its determination.[1]

---

[1] This statute is repealed effective January 1, 2014, pursuant to Ga. L. 2013, Act 127 § 1-1.

Following the termination of parental rights, juvenile courts are not obligated to attempt to place a child with relatives, but need only consider the best interests of the child. *In the Interest of S. R. C. J.*, 317 Ga. App. 699, 705 (1) (b) (732 SE2d 547) (2012). "Because there is no conclusive preference given to relatives, the juvenile court is afforded wide discretion to determine whether a child should be placed with a relative or kept in a stable foster home." (Citation and punctuation omitted.) *In the Interest of J. J.*, 299 Ga. App. 271, 277 (3) (682 SE2d 349) (2009). See also *In the Interest of S. N.*, 291 Ga. App. 628, 633 (2) (662 SE2d 381) (2008) (no abuse of discretion found where juvenile court declined to place children with parents of mother's ex-husband, with whom children had no relationship, biological or otherwise).

In their sole enumeration of error, the Blankenships argue that although DFACS promised to place the grandchildren with them, it never had a genuine intention of doing so, and thus "[s]imilar to the doctrine of promissory estoppel, DFACS should not be permitted to make promises to parties and create the expectation of placement and then withdraw their commitment . . . [and] the trial court . . . should not adopt such an effort."

As an initial matter, the Blankenships cite no authority for this proposition. Also, they do not point us to anything in the record, nor do we find any such evidence, showing that DFACS *promised* to place the children with them. It is clear that DFACS *considered* but ultimately rejected them for placement.

At the dispositional hearing, a DFACS supervisor testified that Tammy Blankenship asked for the children to be removed before a home evaluation could be completed. The supervisor also testified that Tammy Blankenship appeared to have trouble bonding with D. L. T. and showed favoritism to H. S. B., and stated that she believed Tammy Blankenship asked for custody of D. L. T. only when DFACS made it clear that the children would not be separated. She testified that DFACS was concerned about placement with Tim and Tammy Blankenship because the latter knew that D. L. T. was being neglected but did not inform DFACS or attempt to protect him. The supervisor cited an occasion where Tammy Blankenship visited a hotel where the mother was living and found D. L. T. locked in a bedroom and screaming, but did not call DFACS or explain why she took no action. The supervisor also expressed concern over whether Tim and Tammy Blankenship could protect the children given that while the children were living with them, Justin Blankenship had been at their home, drunk and disruptive, and they had not asked him to leave, and

because the Tim and Tammy Blankenship had asked if he could move back into their home.

A licensed professional counselor testified as an expert for DFACS after observing six hour-long visitations between D. L. T. and Tim and Tammy Blankenship, and after doing individual counseling with D. L. T. The counselor testified that D. L. T. was aggressive toward or withdrawn from Tammy Blankenship during these visits, kicking her at one point and at another retreating into the fetal position. D. L. T. also displayed disturbing behaviors in his foster home following visits with Tammy Blankenship, including urinating on himself and the floor, soiling himself and spreading it on the couch, and screaming that he would have to leave his foster home and that he "had to" visit with Tammy Blankenship. The counselor observed that D. L. T. was affectionate and bonded with his foster parents, but generally was not affectionate with Tammy Blankenship, would turn his head when she tried to kiss him, and had not bonded to her. Because of the aforementioned behaviors, the therapist recommended that his visits with Tim and Tammy Blankenship be stopped and that D. L. T. not be placed with them. She also recommended that D. L. T. and H. S. B. be placed in a home together because of their sibling bond and that it was in their best interest to remain with their foster family.

A licenced psychologist who meets with D. L. T. on a weekly basis also testified on behalf of DFACS. She testified that when she first started seeing D. L. T. in 2011, he was emotionally unstable, had anger issues, and was aggressive. When she asked him why he was so angry, he stated that he did not like to visit with Tammy Blankenship but had no choice. After his visits with Tim and Tammy Blankenship were terminated, the psychologist testified that D. L. T.

> calmed down quite a bit. He's not nearly as angry. He's not nearly as aggressive. The nightmares that had reoccurred during that period of time were again not a problem. In fact, he didn't have any after the visits stopped. During those visits, he had been wetting and soiling himself and that [re]gression had also corrected itself after the visits.

She testified that D. L. T. had bonded with his foster parents, and that removal from the foster home would be difficult and damaging to him, and probably to H. S. B. as well.

Tammy Blankenship testified that she did not have problems standing up to her son, denied that he would be allowed at the home if she got custody of the children, and testified that she wanted custody of both children, not just H. S. B. She stated that when she asked DFACS to remove D. L. T., she thought the removal would be temporary.

7

The children's foster mother testified that she and her husband wanted to adopt the children, that the children were bonded to one another and to her and her husband, and that D. L. T.'s behavior improved once the visits with Tim and Tammy Blankenship stopped.

After the above-described hearing, the juvenile court entered an order denying request to place the children with Tim and Tammy Blankenship. The juvenile court instead gave custody to DFACS in preparation for the children's adoption by their foster parents. In that order, the juvenile court found that Tammy Blankenship minimized Justin Blankenship's violent behavior and his drinking problem and "gave little thought as to how the parent's dysfunction affected her grandchildren." The court considered placing the children with Tim and Tammy Blankenship, but noted that because of their "denial and co-dependency issues," DFACS had asked them to attend counseling. Although they were "involved once" with counseling, it was with a non-licensed, unqualified provider, and they failed to provide verification that they obtained the needed counseling. The juvenile court found that DFACS announced in November 2011 that it would begin transitional visits with the grandparents, but 15 months later, the visits had not yet begun because the grandparents had failed to provide required documents. Visits finally began, but the children's therapist

recommended that they be discontinued after only six visits because of the problems with D. L. T.'s behavior. The juvenile court further found that Tim and Tammy Blankenship "failed to protect [D. L. T.] when he was two from the abuse suffered at the hands of [his mother and Justin Blankenship]," and later called DFACS to "come and get him" because they were unable to handle him. The juvenile court found that because of their denial issues, the grandparents were unable to parent the two children on their own and would not protect the children from their mother and Justin Blankenship. The trial court also found that placing the children with Tim and Tammy Blankenship or separating the children would cause emotional harm, and that placement with the Blankenships was not in the children's best interest.

Although there was some conflicting testimony, this Court will not re-weigh the evidence, nor will we reevaluate the credibility of witnesses. See *In the Interest of D. B.*, 306 Ga. App. 129, 137 (1) (701 SE2d 588) (2010). Thus, in light of the evidence outlined above, "the juvenile court did not abuse its discretion in determining that the children should be kept in their stable foster home rather than placed with [Tim and Tammy Blankenship]." (Citations omitted.) *In the Interest of J. J.*, supra at 278 (3). Nor did the juvenile court abuse its discretion in determining that "placement of [H. S. B.] with [her] paternal grand[parents] would result in the

9

siblings no longer being together, while continued placement in the foster home would allow the siblings to remain together and be adopted by the foster parents." *In the Interest of M. C.*, 287 Ga. App. 766, 771-772 (3) (653 SE2d 120) (2007). We find no error.

*Judgment affirmed. Barnes, P. J., and Miller, J., concur.*